Harry R. MOSS, Plaintiff,

v.

William A. BURKHART, State Treasurer; Andy Anderson, State Auditor; and J. D. Dunn, Lawton Leininger and Mike Conners, composing the Oklahoma Tax Commission of the State of Oklahoma; Clee Fitzgerald, Chairman, Herbert F. Hewett, Vice-Chairman, and Louie R. Geiser, Secretary, Members of the State Election Board of the State of Oklahoma; J. Howard Edmondson, Governor of the State of Oklahoma, Defendants,

and

M. A. Price, John M. Rasberry, J. R. Hutchens and Roy Grimes, Directors of Oklahomans For Local Government, an unincorporated association, et al., Intervenors.

No. 9130.

United States District Court
W. D. Oklahoma.
April 30, 1962.

Further Statement of Facts and Law on the Merits and Interlocutory Decree June 19, 1962.

On Motion to Alter or Amend Decree Aug. 3, 1962.

Dissenting Opinion Aug. 8, 1962.

Rizley, District Judge, dissented on motion to alter or amend decree.

886

---

Sid White, Oklahoma City, Okl., for plaintiff, Harry R. Moss.

Delmer Stagner, Oklahoma City, Okl., for defendant William A. Burkhart, State Treasurer.

Fred Hanson, First Asst. Atty. Gen., Albert D. Lynn, E. J. Armstrong, Oklahoma City, Okl., for defendants Andy

Anderson, State Auditor, and, J. D. Dunn, Lawton Leininger and Mike Conners, composing the Oklahoma Tax Commission of the State of Oklahoma.

John Wagner, Oklahoma City, Okl., and Robert Blackstock, Bristow, Okl., for defendants Clee Fitzgerald, Chairman, Herbert F. Hewett, Vice-Chairman, and Louie R. Geiser, Secretary, Members of the State Election Board of the State of Oklahoma.

Norman Reynolds, Oklahoma City, Okl., for defendant J. Howard Edmondson, Governor of the State of Oklahoma.

Leon S. Hirsh, Oklahoma City, Okl., for Intervenors M. A. Price, John M. Rasberry, J. R. Hutchens and Roy Grimes, Directors of Oklahomans For Local Government, an unincorporated association.

J. A. Rinehart, El Reno, Okl., for intervenor M. A. Price.

G. D. Spradlin, Oklahoma City, Okl., for intervenor Council of Democratic Neighborhood Clubs.

Otjen, Carter, Huddleston & Otjen, Enid, Okl., for intervenor Oklahoma Farm Bureau.

V. P. Crowe, Oklahoma City, Okl., for intervenor League of Women Voters.

Before MURRAH, Circuit Judge, and RIZLEY and DAUGHERTY, District Judges.

MURRAH, Circuit Judge.

### The Pleadings

This class action is a sequel to Radford v. Gary, D.C., 145 F.Supp. 541, in which another named plaintiff assailed the Oklahoma Apportionment Statutes for the election of the members to the Oklahoma Legislature, as a deprivation of the equal protection of the laws, vouchsafed to him by the Fourteenth Amendment to the United States Constitution. Like the named plaintiff in the Radford case, the plaintiff here is a citizen and resident of Oklahoma, and a qualified voter of the most populous County in the State. As such representative citizen and voter, he alleges that because of the shifting population of the State of Oklahoma from the rural sections to the cities and urban areas, and because of the failure and refusal of the Legislature to reapportion its members as required by Article 5, Section 10 of the Oklahoma Constitution, the legislative department has become so grossly malapportioned that the ballot or vote of the plaintiff and those similarly situated, for the elected members of the Legislature, amounts to less than one-tenth of the suffrage of other citizens residing in the rural or more sparsely settled communities; that the Legislature has repeatedly refused to reapportion itself in compliance with the constitutional mandate; that Initiative Petitions have failed and the judicial department has confessed its impotence to require compliance, as a consequence of which the plaintiff and his class must suffer the deprivation of due process of law and equal protection of the laws, with reference to taxation and the appropriation of public funds, to the serious impairment of his franchise. The prayer is that this Court recognize and enforce his right to an equal voice in his government, as a civil right within the meaning of the Constitution and laws of the United States; and that the Court declare the legislative department of the State of Oklahoma so malapportioned as to deprive its citizens of a republican form of government, and to deprive the plaintiff, and those similarly situated, the equal protection of the laws; that having so declared, the Court proceed to enjoin the State Auditor, State Treasurer, and Members of the Oklahoma Tax Commission from taking any official actions on appropriations or enactments of those claiming to exercise legislative authority; and, that if the plaintiff be mistaken in the remedy sought, he be then granted such remedy as will relieve and cure the evils from which he continues to suffer.

The plaintiff subsequently moved to make the Members of the State Election

Board additional parties defendant, and amended his complaint to reiterate the deprivation of his franchise by the diminution or destruction of his vote, by reason of the refusal of the Legislature to reapportion itself, as commanded by the Constitution. Plaintiff specifically alleged that the Supreme Court of the State of Oklahoma had, on the 13th day of February, 1962, granted a writ of mandamus, directing the Secretary of the State Election Board, or his successor, to receive filings for the office of State Representative pursuant to the existing election laws, and to comply with any ministerial or other functions required by such laws. (House Bill 1033 of the Twenty-eighth Legislature, 14 O.S.A. §§ 45.1 et seq., 71 et seq., 97–101.)

The plaintiff asserts federal court jurisdiction of the subject matter under 28 U.S.C. § 1343(3); that a justiciable controversy is presented; and, that the plaintiff has standing to maintain the suit. By way of immediate relief, the plaintiff seeks an injunction against the members of the State Election Board, to prevent them from certifying the names of candidates for nomination in the forthcoming May 1, 1962 primary election for the House and Senate from the existing districts, or in the alternative, an order directing the defendant Board Members to certify the said candidates for election by the State at large.

After the case was submitted and set for final disposition on Monday, April 23, 1962, M. A. Price, John M. Rasberry, J. R. Hutchens and Roy Grimes, Directors of Oklahomans For Local Government, an unincorporated association, were permitted to intervene as necessary or proper parties to the suit. In their answer, it was alleged that the State Election Board had performed all ministerial and other functions required by it for the conduct of the forthcoming primary; that all further acts in relation to the pending primary election must be done and performed by the several County Election Boards of the State; and, that such Boards are, therefore, indis-

pensible parties to the relief sought and the suit must, therefore, be dismissed. Further answering, the Intervenors deny the justiciability of the relief sought, as political in nature. They specifically deny that the present apportionment of the Oklahoma Legislature operates to deny the plaintiff and his class the equal protection of the laws, but if so, allege that ample provision is made by the Constitution and laws of the State of Oklahoma for constitutional reapportionment; that within the past two years, the people of the State had, at freely held elections, expressly rejected suggested revisions of their apportionment laws; and, that at the last session of the Legislature, the House of Representatives, by legislative action, did reapportion itself and that such action was approved by the Governor of the State. It is further alleged that a reapportionment, as provided by the Oklahoma Constitution and effected by virtue of shifting and changing population of the State since the adoption of the Constitution, would result in an invidious discrimination against many citizens of the State, and deprive them of the equal protection of the laws. Finally, it is alleged that reapportionment under the Constitution of Oklahoma is vested exclusively in the Legislature; that the Governor of the State is vested solely with the power of convocation; and, that the Legislature is wholly impotent to reapportion, redistrict or reallocate its representation until January, 1963, unless the Governor is required by this Court to call the Legislature into extraordinary session.

Jurisdiction

Federal Court jurisdiction rests upon claimed redress for the deprivation, under color of State law, of a right or privilege secured by the equal protection clause of the United States Constitution. See 28 U.S.C. § 1343. This Court is constituted and convened under 28 U.S.C. § 2284, pursuant to 28 U.S.C. § 2281, to hear and determine the suit, based upon the allegation of the unconstitutionality of the Oklahoma apportionment statutes and the prayer for inter-

locutory and permanent injunction, restraining the enforcement or operation of such statutes.

When the matter came on for hearing on the plea for temporary relief, the Election Board appeared in person and by counsel, and joined in the statement by counsel for the plaintiff in support of the allegations in the Petition. The State Treasurer, William A. Burkhart, appeared by counsel and confessed the material allegations in the Petition. Upon oral motion of the plaintiff in open court, the Governor of the State of Oklahoma, Honorable J. Howard Edmondson, was made a party defendant. He thereupon entered his appearance by his attorney, Norman Reynolds, and consented to be sued as a defendant in this action. The Oklahoma Tax Commission and Andy Anderson, State Auditor, appeared by their counsel, Fred Hanson, Assistant Attorney General.

## Statement of the Case

At the bar of the Court, the parties freely conceded, as did the parties in Radford v. Gary, supra, that the Oklahoma Legislature had, since 1910, failed and refused to reapportion the State in compliance with the mandate of the Oklahoma Constitution. Our attention was called to the Reapportionment Act of 1961 (House Bill 1033) by which the House of Representatives purported to reapportion itself, and that the Oklahoma Supreme Court had adjudged it in noncompliance with the constitutional requirements, on the same grounds for which the prior apportionment acts were held deficient; but, that the Oklahoma Supreme Court had refused to enjoin filings and elections under it on the ground that elections under the pre-existing law would result in far greater inequalities of representation than elections under the 1961 Act. See Jones v. Winters, 369 P.2d 135 (Dec. 19, 1961). And, had ordered the Secretary of the State Election Board to receive filings for office of State Representative under and pursuant to the 1961 Act. Brown v. State Election Board, 369 P.2d 140 (Feb. 13, 1962). It also appears that in 1961, the Oklahoma State Senate attempted to reapportion the entire State for senatorial purposes, but the Act was declared invalid, and the Oklahoma Supreme Court directed the State Election Board to receive filings for the office of the State Senate, pursuant to the apportionment laws in existence since 1941. Reed v. State Election Board, 369 P.2d 156 (Feb. 13, 1962); see also Memorandum Decision in No. 39937, Ludlow v. State Election Board (Feb. 13, 1962).

Speaking through his attorney of record, the Governor of the State of Oklahoma, represented to the Court that he was elected Governor on a program to reapportion the Legislature; that he had recommended reapportionment in compliance with the constitutional mandate to each legislative session during his administration; that he sponsored an Initiative Petition, aimed at constitutional compliance, on which the requisite signatures were obtained, but which was defeated at the polls on September 20, 1960; that as a defendant in Ludlow v. State Election Board, supra, and as amicus curiae in the other recent actions, i. e., Jones v. Winters, supra, Brown v. State Election Board, supra, and Reed v. State Election Board, supra, he made suggestions concerning relief, which in his judgment were within the jurisdictional reach of the Oklahoma Supreme Court; that in his pleas to the Supreme Court, he had offered to convoke a special session of the Legislature, if that Court would assume jurisdiction and indicate its disposition to afford relief, in the event the Legislature failed to act.

The Governor also calls our attention to the pendency of another Initiative Petition to amend the Constitution, to transfer the enforcement of the constitutional apportionment formula from the Legislature to a Constitutional Apportionment Commission. We are told that the petition was filed in December 1961, bearing approximately 219,000 signatures; that a protest has been filed and is now pending before a Referee of the State Supreme Court; that in the last

sixteen years, no Initiative Petition has received the required vote of the people and that, in any event, the pending petition cannot be voted upon in sufficient time to provide the basis for election of members to the Legislature for the 1963 session.

Based upon this experience, the Governor expressed the view that further attempts at reapportionment by legislative or initiative action would be vain and futile; that if the plaintiff and his class are to be afforded the equal protection of the laws, vouchsafed to them by the Constitution, they must find it here—that this Court is the only effective source of relief. Based upon this conviction, the Governor has willingly entered his appearance as a defendant in this case and now offers to convoke the Legislature in extraordinary session, under Article 6, Section 7 of the Oklahoma Constitution, for the specific purpose of enacting a system of election laws in consonance with constitutional requirements, or call a special election under Article 5, Section 20 of the Oklahoma Constitution and 26 O.S., Section 541, for the purpose of filling any vacancies resulting for failure of the forth-coming primary on May 1, 1962. It is suggested that the cost of any special election may be paid from appropriations from the Governor's contingency fund, and such funds are pledged for that purpose as the occasion arises.

The Election Board, responding through its attorney of record, represents that it is being required under mandamus of the Oklahoma Supreme Court to accept filings and conduct elections for the offices of both branches of the Legislature, in disobedience to the Constitution of the State of Oklahoma, and in violation of the equal protection clause of the Constitution of the United States—all in violation of their respective oaths of office. We are urged by the Election Board to grant the relief sought, as the only available and effective remedy.

The parties agree, as indeed they must, to the population of the State of Oklahoma, as evidenced by the 1960 Decennial Census, and to the distribution of the population by Counties, as shown by such census. They also agree to the representation of the Legislature by Counties and Districts, and while the Intervenors do not seem to deny the allegations of the complaint to the effect that the apportionment of legislative representation to population results in a disparity of voting strength between the populous and sparsely populated voting districts, they specifically deny that such numerical inequality is invidiously discriminatory, and offer to prove that by reason of the peculiar economic and geographic characteristics of the presently constituted voting districts, the voting disparity is constitutionally justified, and rationally affords the citizens of the State of Oklahoma, including the plaintiff and his class, the equal protection of the laws.

## Justiciability and Standing To Sue

A majority of the Court in Radford v. Gary, supra, denied relief in the face of a confessed deprivation of constitutional rights, under color of State law, because of the positive admonition to refuse to exercise our "equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions." South v. Peters, 339 U.S. 276, 277, 70 S.Ct. 641, 94 L.Ed. 834. Our decision was influenced by what seemed to be the prevailing view in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, and we were affirmed per curiam on authority of that case and Kid v. McCandless, 352 U.S. 920, 77 S.Ct. 223, 1 L.Ed.2d 157. Now, however, all such jurisdiction and justiciable doubts have been resolved by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. Jurisdiction of this Court to entertain the suit and to grant appropriate relief is no longer doubtful. Not only is our jurisdiction clear, but we are, indeed, importuned by all the parties, other than the Intervenors, in this suit to grant the long-

sought and often denied relief, by some appropriate remedy.

The plaintiff and his class seek to protect or vindicate an interest of their own—"a plain, direct and adequate interest in maintaining the effectiveness of their vote," not merely a citizen's interest in good government. See Baker v. Carr, 82 S.Ct. p. 705. Having jurisdiction of a justiciable controversy, this Court is empowered to secure equitable or other relief for the denial of a constitutionally protected right.

### The Case for Temporary Relief

■ ■ As a prerequisite to any relief, it is, of course, incumbent upon the plaintiff to establish the unconstitutionality of the Oklahoma Apportionment Statutes, and plaintiff cannot sustain that burden by merely showing a disparity in the voting strength of the various electoral districts. Numerical inequality of voting strength does not necessarily prove a case for the deprivation of voting rights. An actionable deprivation results only from an invidious discrimination—a disparity without rationality. MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3; McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed. 2d 393; Baker v. Carr, supra. It seems fair to say, however, that a disparity of ten to one in the voting strength between electoral districts makes out a prima facie case for invidious discrimination, and calls for strict justification.

■ It must be conceded by all, that the present statutory apportionment does not comply with the Oklahoma Constitution. But, even so, a statutory apportionment which does comply with the State Constitution, does not, ipso facto, afford the equal protection of the laws, guaranteed under the Fourteenth Amendment. The test to be applied is found in the federal Constitution and, as we have seen, turns on the rationality of the apportionment.

No one has suggested that the challenged apportionment laws were conceived or enacted with the thought or purpose of affording substantial equality of voting rights, as between electoral districts. Until now, the Oklahoma Legislature has proceeded on the premise that the matter of allocating voting strength was strictly within their discretion, or even caprice. The Intervenors offer to show in retrospect a rational basis for the disparity, and they are, of course, entitled to their proof and they will be heard. Meanwhile, we can find no rational basis for saying that a vote in one electoral district which is worth ten times the vote in another electoral district for the same legislative body, affords the equal protection of the law to the disfavored voter. On the face of the present record, the apportionment for the State of Oklahoma appears to be closely akin to the "crazy quilt" apportionment in Tennessee.

■ This brings us to the matter of the appropriate relief to be afforded, pending the final determination of the case on its merits. A majority of the Court has reluctantly declined immediate interlocutory relief in the form of an injunction forbidding the forth-coming May 1, 1962 primary election, or alternatively, ordering the election to be conducted at large. Our reasons may be summarized as follows:

Because of the Intervenors' tendered issue of rationality, the drastic and unprecedented relief sought is deemed inappropriate. The effect of such an injunctive decree would be to disrupt a long established electoral system on unsettled facts.

Moreover, there is some question concerning the effectiveness of an injunctive decree, in view of the fact that candidates for the legislative offices have already been certified to the County Election Boards for the conduct of the election and the canvassing of the votes. Indeed, we are told that some of the candidates for the offices involved are unopposed, either in the forth-coming primary or the general election, and are, therefore, presently entitled to a certificate of election. In order to give uniformity of relief, it would thus be necessary to in some way void these certificates of elec-

tion, and declare these offices vacant. The result would likely be confusion and chaos, and provocative of interminable litigation.

Additionally, we have no assurance that the present Legislature, even if convened in extraordinary session, would enact a constitutionally acceptable system of apportionment and election laws for the nomination and election of its successors, prior to the 1963 session. In which event, under the provisions of the Constitution of the State of Oklahoma, the present members of the Legislature would continue to hold their offices until their successors were elected and qualified—presumably in 1965. See Article 23, Section 10, of the Oklahoma Constitution. It would be an awkward and clumsy thing for this Court to undertake to reapportion and redistrict the Legislature of the State of Oklahoma, in accordance with some judicially devised formula, and even more difficult to attempt to supervise special nominations and elections to the reapportioned Legislature. Certainly, we should undertake this essentially legislative function only as a last resort.

This does not mean, however, that the task is insurmountable or that we will not undertake it, if the circumstances ultimately compel it, nor does the denial of immediate relief herein mean that the present Legislature should not be afforded an opportunity to enact prospective reapportionment laws, in accordance with the supreme law of the land, as announced in Baker v. Carr, supra, and to which we all owe allegiance and are amenable. The Legislatures of other states have taken appropriate action to comply with the constitutional requirements, when faced with the inescapable duty of doing so. See Asbury Park Press v. Woolley, 33 N.J. 1, 161 A.2d 705; Application of Lamb, 67 N.J.Super. 39, 169 A.2d 822; Magraw v. Donovan, D.C., 159 F.Supp. 901, D.C., 163 F.Supp. 184, D.C., 177 F.Supp. 803. See also Sims et al. v. Frink, Secretary of State of Alabama, et al. (D.C.1962) 205 F.Supp. 245. Meanwhile, this case will proceed to

issue and determination on its merits, with all deliberate speed.

## FURTHER STATEMENT OF FACTS AND LAW ON THE MERITS

When this case came on for hearing on motion for temporary relief, we held the complaint sufficient to state a justiciable controversy, cognizable under 28 U.S.C. § 1343, of which this three-judge Court has jurisdiction under 28 U.S.C. § 2284, pursuant to 28 U.S.C. § 2281. We expressed the view that a numerical disparity of as much as ten to one in legislative electoral districts, raised a serious question of malapportionment, which may very well constitute a prima facie case for invidious discrimination.

The Intervenors offered to show in retrospect a rational basis for the disparity, and we denied temporary injunctive relief and ordered the case to proceed to issue and trial on its merits "with all deliberate speed."

The case now comes on for trial on its merits, the parties appearing in person or by counsel, as in the former proceedings. From the stipulations, evidence, and other facts of judicial notice, we find that there has been only token reapportionment by the State of Oklahoma of its legislative body since 1911. Both branches of the Legislature have consistently disregarded the provisions of the State Constitution, with respect to reapportionment, with no thought of affording the equal protection of the laws. While there have been a number of attempts to reapportion by Initiative Petition and Referendum, all such proposals have been defeated at the polls. There is now pending in the Supreme Court of Oklahoma, a further Initiative Petition, providing for constitutional reapportionment through the medium of a Reapportionment Commission. This petition has been vigorously opposed by the Intervenors in this case, and has been pending in the courts for more than five months.

The application of the 1960 Federal Census in Oklahoma to existing legisla-

tive apportionment, graphically demonstrates the present numerical disparity in the relative weight of the votes cast for respective members of the Legislature. By reference to this census, as applied to the present legislative apportionment, one vote for legislative Representative in Cimarron County is equal to fourteen votes for the same office in Oklahoma County, and eleven votes in Tulsa County. The numerical disparity existing in the Senatorial Districts is even greater. For instance, one vote in Senatorial District No. 26, comprising Love and Marshall Counties, equals 26.4 votes in District No. 31, comprising Tulsa County. The facts reveal that 61 members of the House of Representatives, constituting a majority, represent 26% of the total population of the State. The other 60 members of that House represent 74% of the population, or an average of 28,642 persons per Representative. Reduced to its simplist terms, this means that a majority of the Legislature is responsible to only 26% of the population and that the remaining Representatives represent 74% of the people.

Applying this analysis to the State Senate, it will be seen that nine Senators represent 52% of the people, or an average of 128,642 persons per Senator; the other 35 Senators represent about 48% of the population. In terms of voting strength, this means that a great majority of the Senators are answerable to slightly less than one-half the people, and that nine of the 44 Senators represent 52% of the population.

Approaching these statistics from another point of view, all but 15 of the 77 districts are over-represented, when their actual population is compared to that which would be required to make up the State constitutional ratio, under the present census. Summarizing further, the facts reveal that there are discrepancies under present apportionment of as much as twenty-six to one, in the weight of an individual vote.

■ While mere numerical disparity in voting strength is not, per se, invidiously discriminatory, it is, to be sure, cogent evidence of it and, as we have seen, may be sufficiently disproportionate to constitute a prima facie showing. This is so, we think, because under our democratic institutions and republican form of government, the suffrage right of the individual is, and must be, the keystone—the common denominator, of self-government. Indeed, the framers of the Oklahoma Constitution recognized this inalienable principle by providing that population should be the primary basis for electoral diffusion. See: Article 5, Sections 9 and 10, of the Constitution of the State of Oklahoma. Under the Oklahoma Constitution, the principle of numerical equality is the rule, and any deviation is the exception. Jones v. Freeman, 193 Okl. 554, 146 P.2d 564. We think this principle should also be our guideline in determining whether the equal protection of the laws has been honored in the State electoral processes. There may be relevant counter-vailing factors, such as geography, economics, mass media and functional or group voting strength. But none of these factors, whether considered separately or collectively, can overcome the basic principle underlying the right of an individual to cast an effective vote. See: Excerpts from testimony of Dr. Joseph Pray, attached hereto as Appendix.

Intervenors have specifically denied the irrationality of the existing numerical disparity and contend that apportionment in accordance with the mandate of the Oklahoma Constitution would operate to deprive them of the equal protection of the laws. They seem to say that any deviation from the present apportionment would be a deprivation of their rights. In sum, they claim a Federal constitutional right in the present apportionment.

■■ Before this case came on for hearing, Intervenors moved for a continuance, and renewed the motion on the hearing date, in order to obtain sufficient time to correlate and evaluate what they considered competent data, justifying the existing apportionment. Par-

ticularly, they set forth eight (8) separately numbered categories of statistical data and information, allegedly requiring additional time for compilation. An examination of each of these categories reveals that all of the suggested data or information is, and has been, at all times readily available in the form of public records to the Intervenors or, for that matter, to any interested person. Moreover, it may be that the suggested factors are a product of, rather than a rational basis for, the existing discrimination. Surely, one may not acquire a constitutional right to a status, which is created by the persistent disregard of constitutional precepts. In short, the Intervenors may not pull themselves up by their own unconstitutional bootstraps. Additionally, it should be noted that more than fifty days have elapsed since the denial of temporary relief and the case was ordered to trial on its merits. Even so, we cannot believe that Intervenors have been prejudiced in any manner by the unavailability of any information which they say is pertinent. We are thus brought to the conclusion that if the Intervenors have a defense, based upon the rationality of the present apportionment, they have not diligently pursued it. The continuance was consequently denied.

■ On this record, the Court concludes that the existing apportionment of the offices of both houses of the Oklahoma Legislature is grossly and egregiously disproportionate, and without rational basis or justification in law or fact. We conclude that the apportionment of the Legislature of Oklahoma, under and by virtue of its apportionment statutes is invidiously discriminatory against this Plaintiff and his class of voters, and all such statutes are, therefore, unconstitutional and void.

■ The Plaintiff and his class are entitled to appropriate equitable relief, which will substantially insure the numerical reapportionment of the Oklahoma Legislature, in a manner to accord the Plaintiff and his class the equal protection of the laws, guaranteed by the Fourteenth Amendment. The Court has not heard evidence on the appropriateness of the relief, and the matter is set for further hearing on the 31st day of July, 1962, for the purpose of determining the form of relief to be granted. Meanwhile, it seems desirable to note some of the suggested remedies, to which the Plaintiff may be entitled:

1. Reapportionment by the Legislature itself. This, of course, is the most desirable and the most efficacious, for, as we have said, the constitutional duty rests first and foremost upon the legislative body, whose duty it is to observe and comply with the supreme law of the land, as it is judicially construed and applied.

2. Initiative and Referendum. We, of course, have in mind the pending Initiative Petition as a possible available remedy, but the right asserted here cannot be made to depend upon the will of the majority. It is founded in the Federal Statute, which gives redress for the deprivation of civil rights, including the integrity of the ballot.

3. Reapportionment by Judicial intervention, either by some judicially devised formula or election at large until constitutional apportionment is achieved by legislative action. Neither of these alternatives are desirable, and will be resorted to only if the Legislature fails to constitutionally reapportion itself, so as to afford equal protection of the laws. In that connection, it should be noted that there is ample time for the Governor of this State to call the present Legislature into extraordinary session for the specific purpose of enacting a system of reapportionment laws, which will comply with the requirements of the equal protection of the laws. In this manner, the Legislators will be free to act, unencumbered and unentangled with the legislative problems which will confront the general session, convening early in 1963. If, therefore, the Legislature is in special session, or has been called before the date fixed herein for final judgment, the case will be continued until September 10, 1962 to await legislative action.

If and when, in the course of this litigation, it becomes necessary to bring about constitutional reapportionment by direct judicial action, it will be time enough to hear and consider any countervailing factors, which may enter into the equation of reapportionment, based essentially upon population. Until that day, the judicial hand is stayed.

## APPENDIX

Excerpts from the Testimony of Dr. Joseph Pray, at the Hearing held June 12, 1962.

"Q. (By MURRAH, C. J.) Doctor, may I ask you a question which, in my judgment, goes to the heart of this lawsuit. You understand that the plaintiffs in this case, who are qualified electors in a populous County in the State, are here complaining that the present apportionment laws of the State of Oklahoma operate to invidiously discriminate against them in the exercise of their voting rights. You also understand this Court is empowered to hear and determine that complaint, and what we are now seeking to determine is whether or not the present apportionment laws of this State infringe the equal protection clause of the Fourteenth Amendment in that it invidiously discriminates against these plaintiffs. You understand that?

"A. (By Dr. Joseph Pray) I do, yes sir.

"Q. The Supreme Court of the United States has said that the equal protection of the laws, guaranteed by the Fourteenth Amendment, does not assure a proper diffusion of political initiative as between its thinly populated Counties and those having concentrated populations. You understand that?

"A. Yes sir, I understand diffusion.

"Q. * * * (T)he Courts have said that the equal protection of the laws does not require a State to achieve numerical equality with exactitude. That is to say, there may be some disparity between one County and another, so long as it doesn't amount to invidious discrimination.

"A. Yes sir.

"Q. That is the key word, and if we analyze what invidious discrimination means, then we quite understand what the Courts are talking about. Now then, we have the proof here, and it stands undisputed, that there has been no reapportionment since statehood. Meanwhile, as you know, we have had a rather radical shift in population into the metropolitan centers of the State, and so we stand here on the facts, with a wide disparity of representation on a ratio which is shown here as much as one to 26. You understand that fact?

"A. Yes, sir.

"Q. Now then, on a population basis, and the facts before this Court demonstrate beyond any doubt, that there is a wide disparity in population with respect to representation, in ratio, to representation in the legislative body. My question is, what other factors should the science of government take into consideration, and therefore, what other factors should this Court take into consideration in terms of equal protection of the laws, to assure a proper diffusion of political initiative? What factors, other than numerical representation, should we take into consideration? You could help this Court immeasurably, if you would enlighten us on that.

*　*　*　*　*　*

"A. This is a fundamental question. * * * It goes very much to the heart of the whole issue, and I am thinking of Baker versus Carr and the majority and minority opinions, and the various views expressed there. * * * We are going to come back to this problem many, many times in the next five years, but I did refer to this, it seems to me, possibly anticipating this question, when I talked about the necessity to start at some place when it comes to the diffusion of political power. This is the key to politics. * * * To start at some place where the common denominator is the individual. We are talking about human society. The study of politics, particularly in recent years, has been very much interested in not who has suffrage, but who is influential in the legislative arena, the sub-

896

ject of pressure groups for instance, how influential they are, and how does a person go about getting enough campaign funds or how to run an effective campaign. It goes into the question of mass communication. It refers to whether the plaintiffs, being in an urban area, don't have counter-vailing facilities at their disposal. The metropolitan press has been a matter of great contention in a State like ours. It is hard to tell whether it helps you or hurts you. It has been a question of whether this large group was more significant than this little person, who may or may not be their representative. Take the majority position in Baker versus Carr, in terms of when you should presumably strike down an apportionment scheme, if there is no rational basis.

"Q. We are asked to strike down the present statutory apportionment on the ground it operates invidiously to discriminate against this particular plaintiff and those like him.

"A. The operation of the scheme?

"Q. Yes, the operation.

*　*　*　*　*　*

"A. * * * The majority view stresses the suffrage phase of this question. This is a very important point to me, to the extent of what you had in Tennessee, and which is not different much from our situation, it seems to me.

*　*　*　*　*　*

"A. * * * And to the extent you have one to 26, you have a diffusion of suffrage power which is as bad as if the vote was not counted because of fraud or some other reason it would also violate it, or if the discrimination on suffrage grounds was based on race, let us say, the white primary cases are especially, as long as you look at it in terms of whether or not this vote is being made effective, and you appreciate that our National constitution, for various reasons, calls for our votes being made effective. This sort of thing, and this sort of analogy, which, I think, is a very good analogy, when it takes into consideration there are people being affected because their

votes—this sort of thing wouldn't condone much interference with the basis of numbers.

"Q. Nor any room for tolerance?

"A. Not any room for tolerance. * * there is a rough and ready relationship here which some how is a necessity, if you think a person's vote should be counted. Now about these counter-vailing factors which come regularly. I think society will have to take care of those other ways but again when we divide the access to power by giving people the right to vote, the privilege of voting although some authority disregard it, you can bring these counter-vailing factors in. Some place you have to start in a Democracy with the general principle of numerical equality.

*　*　*　*　*　*

"Q. * * * assuming one County traditionally casts * * * a much higher percentage of its qualified electors, and the populous County doesn't. Can we take that into consideration?

"A. One doesn't exercise its right—

"Q. Declining the constitutional right to do so if he chooses. Is that what you are talking about?

"A. I will say you cannot take that into consideration. * * *

*　*　*　*　*　*

"Q. May I ask you this question: As I understand the testimony today, as stated a moment ago, we have a wide disparity in America. That stands, either admitted or not. Do you think of any other factors by which this Court could justify it in terms of equal protection of the laws?

"A. In other factors but numbers?

"Q. Yes. Any other factors that would justify or by which this Court could say in the fact of this * * * obvious disparity, that it may be justified as affording the equal protection of the law?

"A. I don't think so. I will make one little modification in a minute but the experience with functional representation where it has been tried in

Europe as part of their legislative process. * * * This is a thing Germany tried for years * * * on the assumption (of) * * * working out a system of representation which is mostly more vital because some of the dynamic aspects of political decisions go off on organized efforts rather than the efforts of individuals; when you try functional representation. * * *

"Q. Will you explain what you mean by functional?

"A. The use of an economic council which would set up an individual body instead of individuals and based on the representation of the dynamic economical groups in the state and one of the legs this thing falls back on; to keep that representation, three per cent or whatever it is. Would it be three per cent ten years from now and so on? The political groupings of dynamic interest groups in our political life is a rapidly changing arrangement. They have come to the fore very significantly today and not so much tomorrow. * * * This is a prime example of using other groups rather than the individual, economic representation. It has bogged down because political decision has to be made somewhere. * * * You start with the individual and you try to adhere to him, as a basis rather than use a functional group. If you built in a favorable position for a favorable minority group, how would you get rid of it? How would the dynamics be developed if you would regroup it?

"Q. Under our system of government the dignity of the individual is recognized and the individuals are here * * asserting a personal right in that connection, and, of course, we are concerned not with classes so much as we are the dignity of the individual and his personal right to vote and have his vote counted. That is our inquiry and that is our concern. Then as I understand your testimony, and I certainly don't wish to put any words in your mouth, as I understand your testimony, you say as a student of the science of government and as a student of our particular problem

here, do you not think that economic or political factors that enter into the equation are such as would justify the numerical disparity?

"A. Justify going against the numerical arrangement?

"Q. Yes.

"A. I don't. I do not think there should be any group.

"Q. Do you know of any factors?

"A. There is no question but what minority groups, and it might be an urban minority or a rural minority, the minority groups will struggle like everything to get more power, decision making or whatever their members call it. So there will always be this striving, that is assured, but this should not be the starting point. You should start with the individual and dignity of the individual and all of that.

"Q. Something that approximates numerical equality.

"A. Yes.

"Q. Is that your starting point?

"A. The starting point is there."

INTERLOCUTORY DECREE

Be it remembered, that this class action came on regularly for hearing June 12, 1962, pursuant to notice, on the petition of the Plaintiff and his class to annul the apportionment statutes of the State of Oklahoma, as violative of the equal protection clause of the Constitution of the United States, and a deprivation of his and their civil rights under 28 U.S.C. § 1343. The parties appearing in person, or by counsel, as indicated in the former hearing. The Court having received evidence and having taken judicial notice of pertinent matters, and being fully advised in the premises, doth find and conclude:

1. That this specially constituted three-judge Court has jurisdiction of the subject matter and of the parties, with the power to hear and decide the controversy presented by the pleadings.

2. The Court is of the opinion that the existing statutes of the State of Ok-

898

lahoma, relating to apportionment for the nomination and election of the members of both houses of the Oklahoma Legislature are invidiously discriminatory against the Plaintiff and his class; hence, null and void.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Title 14, Secs. 9–77, inclusive, 99 and 100 O.S. (1961), and Article 5, Section 11 of the Oklahoma Constitution, where presently operative, be, and they are hereby declared prospectively null and void, and inoperative for all future elections.

IT IS FURTHER ORDERED that this cause be continued until July 31, 1962, for the effectuation of appropriate relief and final judgment.

## ON MOTION TO ALTER OR AMEND DECREE.

### PER CURIAM.

The above matter came on for hearing pursuant to assignment on the 31st day of July, 1962, on the Motion to Alter or Amend Decree, filed by the Intervenors M. A. Price, et al., Directors of Oklahomans For Local Government, an unincorporated association, and for a consideration of the various remedies for reapportionment suitable for implementation in view of the previous Interlocutory Decree entered by this Court on June 19, 1962.

The said Motion to Alter or Amend Decree is overruled, except by way of clarification it is the order of the Court that the scheduled general election, to be held on November 6, 1962, is not affected by the order of this Court entered on June 19, 1962 to the effect that the laws under which the present legislature of Oklahoma is apportioned are "prospectively null and void and inoperative for all future elections." The forthcoming November 6, 1962 election is not a "future election" within the meaning of said Interlocutory Decree, but is an election under way and in being at the time said order was entered, the same having started with the filing period in February, 1962, and having con-

tinued through primary and runoff elections with the said general election remaining to be held to complete the election process. See: Gragg v. Dudley, 143 Okl. 281, 289 P. 254. Moreover, by reapportionment being necessarily prospective in nature and being accomplished for future effect, said Interlocutory Decree applies to the elections of 1964 and future elections, including any election that may follow the 1962 election which is now in progress and has been since February, 1962.

With reference to a consideration of the remedies available to effect future reapportionment and the selection of a constitutionally acceptable remedy, the Court is of the opinion and decides that it defer action to the general session of the Oklahoma Legislature to be held in 1963, with a date to be fixed for final action in the matter by such Legislature and with positive guidelines or standards now being furnished said Legislature in the matter of discharging its responsibility to reapportion both houses of said Legislature for the 1964 and ensuing elections.

The following guidelines or standards are established:

#### 1.

The Oklahoma Legislature will be reapportioned on the general principle of substantial numerical equality, to the end that each voter shall have approximately the same power and influence in the election of members of the two houses, which is in consonance with the intent and spirit of the Oklahoma Constitution and the equal protection clause of the Fourteenth Amendment of the United States Constitution.

#### 2.

The House of Representatives of the Oklahoma Legislature will be reapportioned in accordance with the provisions of the Oklahoma Constitution relating to such House, except the Court finds and declares that the seven member ceiling established in Section 10(d), Article 5, Oklahoma Constitution for populous

Counties results in invidious discrimination against the Plaintiff and his class, therefore violates the Fourteenth Amendment of the United States Constitution, and must be disregarded.

### 3.

The said seven member ceiling being eliminated, Oklahoma and Tulsa Counties are entitled to 19 and 15 legislative seats, respectively, under proper reapportionment, under the 1960 Federal Census.

### 4.

 The Senate of the Oklahoma Legislature will be reapportioned in accordance with the provisions of the Oklahoma Constitution relating thereto. In this connection, however, the Court is brought face to face with an irreconcilable incongruity in Section 9(a) of Article 5, of the Oklahoma Constitution, with respect to the formula for apportioning the Senate. This incongruity is caused by the "except" clause in Section 9(a), which creates a discrepancy between the total number of Districts and the total number of Senators. We resolve this incongruity in favor of equality of representation, which is mentioned three times in Sections 9(a) and 9(b), believing as we do that it is in consonance with the general principle of the Oklahoma Constitution, as construed by the Oklahoma Supreme Court in Jones v. Freeman, 193 Okl. 554, 146 P.2d 564, and more nearly conforms to the equal protection clause of the Fourteenth Amendment to the United States Constitution. Applying this general principle of equality, the Oklahoma Senate will thus consist of 44 Districts and 44 Senators. Under the 1960 Federal Census, Oklahoma County is entitled to eight Senatorial Districts and Senators; Tulsa County, seven Senatorial Districts and Senators; and, Comanche County, two Senatorial Districts and Senators. Those Counties having multiple Senatorial Districts will be districted within themselves into the requisite number of Districts by legislative act, provided each such District shall contain as near as may be an equal number of inhabitants; shall be contiguous and compact as practicable.

### 5.

 The matter of forming legislative Districts, either House or Senate, among Counties is left to the discretion of the Legislature, under the pertinent provisions of the Constitution with respect to substantial numerical equality, compactness and contiguity. In this connection the Memorandum and Suggested Order And Decree, filed in this Court on July 30, 1962 by the Honorable Fred Hansen, First Assistant and Acting Attorney General, is recommended as a most helpful treatise, and contains a Suggested Order And Decree which indicates a legislative apportionment for both houses, which has been studied by the Court, and which is believed to meet the desired standards.

Five months hence, when the Legislature convenes, it must reapportion itself in accordance with the constitutional mandate, or be judicially reapportioned. We have withheld judicial reapportionment on the solemn word of the intervening legislators that once their constitutional duty is unequivocally and unescapably clear, they will discharge it with befitting honor and fidelity.

Jurisdiction is retained in this case and the same is continued until the 8th day of March, 1963, at which time the case will be called, and if proper action has been taken by the Oklahoma State Legislature under the guidance afforded herein, the same will be affirmed and approved and this case dismissed. Failing this accomplishment, this Court will then order and decree reapportionment by judicial order, in conformity with the guidance herein furnished.

RIZLEY, District Judge (dissenting).

On June 19, 1962 this Court filed a unanimous opinion in the above styled cause in which it said and I quote:

"The case now comes on for trial on its merits, the parties appearing in person or by counsel * * *. From the stipulations, evidence and other facts of ju-

**900**

dicial notice, we find there has been only token reapportionment by the State of Oklahoma of its legislative body since 1911. Both branches of the Legislature have consistently disregarded the provisions of the State Constitution, with respect to reapportionment, with no thought of affording the equal protection of the laws."

We then reviewed all the attempts that had been made to obtain reapportionment in Oklahoma for the past fifty years, including the attempt by initiative petition and then said: "On this record, the Court concludes that the existing apportionment of the offices of both houses of the Oklahoma Legislature is *grossly and egregiously* disproportionate, and without rational basis or justification in law or fact. We conclude that the apportionment of the Legislature of Oklahoma, under and by virtue of its apportionment statutes is *invidiously discriminatory* against this Plaintiff and his class of voters, and all such statutes are, therefore, *unconstitutional and void.*" (Italics ours).

We further said in our June opinion: "The Plaintiff and his class are entitled to appropriate equitable relief, which will substantially insure the numerical reapportionment of the Oklahoma Legislature, in a manner to accord the Plaintiff and his class the equal protection of the laws, guaranteed by the Fourteenth Amendment."

It should be noted that the Court, after reviewing the history of the Oklahoma Legislature for half a century, was not content with simply using the word "disproportionate", but emphasized that term by using the words "grossly and egregiously disproportionate". Webster's Dictionary defines the word "egregiously" as something that is prominent, eminent, conspicuous for bad quality, flagrant; and the word "invidious" as "tending to excite odium, ill will, or envy; likely to give offense; and unjustly discriminating." Mr. Webster says it is synonymous with "repugnant" and then he defines "repugnant" as "opposed or reciprocally opposed, contradictory,

irreconciliable, as a principle repugnant to constitutional law; that offers resistance, hostile, refractory, distasteful, repellent." "Repugnant implies a nature alien to one's ideas, principles, or tastes, and a stirring up of resistance or loathing; repellent, a forbidding or unlovely quality that causes one to back away; abhorrent, a repugnance that stimulates antagonism."

In keeping with our June opinion, we filed with it a decree in which we said and I quote: "The Court is of the opinion that the existing statutes of the State of Oklahoma, relating to apportionment for the nomination and election of the members of both houses of the Oklahoma Legislature are invidiously discriminatory against the Plaintiff and his class; hence, null and void.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Title 14, Secs. 9-77, inclusive, 99 and 100 O.S. (1961), and Article 5, Section 11 of the Oklahoma Constitution, where presently operative, be, and they are hereby declared prospectively null and void, and inoperative for all future elections."

The majority seem to take comfort in the words "prospectively inoperative" and construe future elections not to mean the November election in 1962. They say further that by us refusing in our first opinion to enjoin the primary election, that we condoned the illegal and unconstitutional statutes, and they say that because the primary and general election is in fact all the same election, that we are obliged to recognize it as a legal election, notwithstanding that we have said the statutes under which it is being held are null and void.

In my search of judicial decisions since the beginning, I am unable to find any decision of any court which says that by condoning a void and illegal statute or by condoning a wrong, you breathe legality into the statute and give a right to those who operate under it, even though it is wrong.

In an endeavor to overturn the earlier opinion of this Court, entered herein on

June 19th, the majority gives two legal reasons unsupported by authority. They say: (1) that the general election to be held in November, 1962 is not a future election; (2) that when we said in June that the statutes under which the legislature is apportioned are unconstitutional and void, they were just void in June and not in August and that we could control the operation of the Constitution.

The only authority cited by the majority in its decree in support of their finding that the general election in November, 1962 is not a future election is Gragg v. Dudley, 143 Okl. 281, 289 P. 254. This case itself is not in point since the interpretation therein that the election process includes registration, primary elections, the general election and the announcement of the election returns is pure dicta insofar as it related to the primaries. There a State Senator sought to run for the office of Lt. Governor. The question was raised that this violated Article 5, Section 23 of the Oklahoma Constitution. All that was necessary to that decision was the ruling that the November election was not complete until the votes were counted and the result made known.

Article 3, Section 1 of the Oklahoma Constitution provides:

"Qualified electors of this State shall be citizens * * * who have resided * * * in the election precinct thirty days next preceding the election at which such elector offers to vote."

Under Oklahoma law a registration period is provided before the primary election, the run-off election, and still another before the general election. If the theory adopted by the majority is correct, the last two named registrations would violate this constitutional provision.

As a practical matter the Oklahoma Supreme Court in the case of Stafford v. State Election Board, 203 Okl. 132, 218 P.2d 617, did distinguish the cited case and said at page 620 the following:

"We agree with the contention of petitioner that the provision of the constitution that members of the House of Representatives must be at least twenty-one years of age at the time of their election means at the date of the general election and not the primary election.

"The Constitution does not prescribe the qualifications of a candidate in a primary election."

In State ex rel. Williamson v. Carter, 177 Okl. 382, 59 P.2d 948, at 949, the Oklahoma Supreme Court said:

"At the time of the adoption of the Constitution, great consideration was given to the question of popular election of public officials. The Constitution required the Legislature to pass a mandatory primary law. Section 5, article 3, Const. However, it has been well recognized not only in this state, but by the highest courts of other states, that there is a wide distinction between 'election' and a primary election; the latter being statutory methods provided for the selection of representatives of the various political parties in the 'elections' provided by the Constitution for the selection of the various state, county, and other public officers."

We submit that it is perfectly obvious that what the majority meant in June and what they now mean are entirely two different things.

The majority in its haste to recede from our June 19th opinion has glossed over a very important question of law. That is to say, where a court, as we did in the June opinion, declares a statute creating public offices null and void, the statute is null and void ab initio. This principle of law is set out at length in the landmark case of Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178. The Supreme Court of Tennessee had earlier declared a statute allowing a board of commissioners to subscribe to railroad stock unconstitutional. The case was appealed to the United States Supreme Court. One of the parties argued that if there was not a de jure officer, that the officers were de

facto. The other party argued that if the statute was unconstitutional, there was no office existing and there could not be a de facto officer. Mr. Justice Field, in answering the question posed, said:

"But it is contended that if the act creating the board was void, and the commissioners were not officers de jure, they were nevertheless officers de facto, and that the acts of the board as a de facto court are binding upon the county."

Said Mr. Field:

"This contention is met by the fact that there can be no officer, either de jure or de facto, if there is no office to fill. As the act attempting to create the office of commissioner never became a law, the office never came into existence. * * * Their position is, that a legislative act, though unconstitutional, may in terms create an office, and nothing further than its apparent existence is necessary to give validity to the acts of its assumed incumbent. That position, although not stated in this broad form, amounts to nothing else. It is difficult to meet it by any argument beyond this statement. An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

Our own Oklahoma Supreme Court followed the United States Supreme Court in the case of State ex rel. Tharel v. The Board of County Commissioners of Creek County, 188 Okl. 184, 107 P.2d 542, which says and I quote:

"The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it had never been passed. It imposes no duties, confers no rights, bestows no power or authority on any one, affords no pro-

tection and justifies no acts performed under it."

As I have heretofore suggested, the majority of the Court seems to take comfort in the words "prospectively null and void and inoperative for all future elections", but the Oklahoma case above cited knocks this argument into a cocked hat by saying courts do not have the power to make a statute inoperative from the point of adjudication forward. Quoting from an earlier Florida case, State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 So. 745, our Court said, at page 547:

"Validity or invalidity relate to the enactment of a statute under the existing organic law and not to a subsequent date. The courts have no power to make a statute inoperative only from the date of an adjudicated invalidity, because the courts merely adjudge that a statute conflicts with organic law, and the Constitution then operates to make the statute void from its enactment, the courts having no power to control the operation of the Constitution."

We are bound to give weight and validity to the Oklahoma authorities, and when the Oklahoma Court has said that courts have no power to say when a statute is or is not inoperative, after once declaring the statute void as being unconstitutional, it would certainly be presumptuous on our part to attempt to control the operation of the Constitution. Far be it from me to say that in a proper case that there is no question but what there is a place for the de facto doctrine, but ours is not such. This doctrine is founded upon consideration of policy and necessity for the protection of the public and individuals whose interests may be affected thereby. Offices are created for the benefit of the public, and private parties are not permitted to inquire into the titles of persons clothed with authority. For the good order and peace of society, their authority is to be respected until some mode is prescribed by law to determine their rights to serve. Such is not the case here. The offices of the legislature were determined null

and void. They no longer exist, and the decree of June 19th contemplated a sure and orderly correction of the situation. The majority has backed away from the strength of the earlier decree and is now taking a position where they sanction that which they condemned. It is an untenable position, and in my opinion it is the unqualified duty of the Court to apportion.

There is positively no evidence in the record to sustain any finding that there is not ample time to have a primary, a run-off, and a general election to elect a constitutional legislature. In fact all of the evidence is to the contrary.

There is also evidence in the records that funds can be made available to hold the elections. This would be legal, right and not postpone the relief to which we say the plaintiff and all of his class are entitled. "Justice delayed is justice denied."

Finally the majority, in order to extricate themselves from the June opinion, state they have withheld judicial reapportionment on the solemn word of the intervening legislators that once their constitutional duty is unequivocally and unescapably clear, they will discharge it with befitting honor and fidelity. I have searched the record and do not find such a promise on the part of any individual legislator. To the contrary, nowhere does the record disclose that any single legislator, much less a majority of both Houses, have represented that the legislature intends to act in keeping with either the State Constitution or this Court's decree. The majority of the State Senate who intervened at the hearing on the remedy state in their pleadings that they desire a legislative session "in order that they may *institute constitutional processes to correct the presently existing discriminatory constitutional provisions*"; further, that "any relief, which the Court might decree, based on census population as aforesaid, would be invidiously arbitrary and discriminatory"; and finally, these intervening defendants contend and attempt to show that the provisions of the Constitution

of Oklahoma, in respect to legislative representation in this State, have become invidiously discriminatory since the adoption of said provisions; "and that said provisions cannot be met or enforced by any legislation conforming thereto without contravention of Amendment XIV to the Constitution of the United States."

These intervenors even question the power of the judiciary to enforce the Fourteenth Amendment and state that any decree herein would be an unlawful derogation of their powers. This was their pleading.

At the hearing they substantiated their intent by introducing a plethora of unexplained and useless figures and charts which they orally stated substantiated their contention that we should ignore the census and that they can ignore substantial equality in apportioning or in submitting constitutional revisions pertaining to apportionment.

Intervenors produced only two witnesses. The Speaker of the House of Representatives, who expressed a hope that the House could reapportion but refused to hazard an opinion as to the ability of the Senate to pass apportionment provisions, and I might say parenthetically, it is obvious that if there is only hope that the House might be able to pass such provisions, there can be no hope that the Senate can do so since it is far more malapportioned than the House. The other witness was a State Senator of many years' service, who would make no stronger statement than he was ready to assume his responsibilities to the people of the State. On cross-examination he admitted that he had always been ready to assume such responsibility, although he further admitted that he had voted against apportionment in accordance with the State Constitution during the previous session. He had served in each of the nine sessions since the State Supreme Court in Jones v. Freeman stated that the question of apportionment went to the "very vitals of democracy", and the Court in the Jones case had further solemnly

placed its faith in the State Legislature to uphold its constitutional oaths. This witness stated he would not comply with the order of this Court but only act after the law is clearly outlined by the United States Supreme Court in subsequent opinions, which may take the Lord only knows how long to convince this Senator and others like him.

It is, therefore, respectfully submitted that my brothers' statement is wholly without basis in the record, and the facts of history for almost half a century disclose that it is wholly without justification and can only lead to a hopelessly chaotic legislative session that can produce nothing more than the submission of a constitutional amendment which, if adopted, would violate the Fourteenth Amendment. Even the Supreme Court of the State of Oklahoma in its most recent opinion, Brown v. State Election Board et al.; Okl., 369 P.2d 140 stated:

"An individual legislator may be willing to vote himself out of an office, but it would be difficult to find one who is willing to vote his constituents out of a legislator contrary to their wishes."

It is respectfully submitted that we should have deferred to the interpretation of the abilities of the legislators to reapportion themselves as expressed by the State Supreme Court and the Chief Executive of the State, who are in a far better position to judge the situation than are we. It is significant that the legislator's solemn word is the only reason given by the majority for staying the judicial hand, and this reason is patently unsound.

We have found a legal wrong to exist. The majority would refer this wronged plaintiff and those of his class to a political remedy. In fact, the political remedy suggested is the very one which has caused the wrong. Therefore, I see no justification for delaying the judicial hand and to the contrary I foresee only chaos as a result of this delay and further complications as a result thereof. This Court has been fortunate in having a Chief Executive, a State Treasurer, an acting Attorney General and a State Election Board that have offered full cooperation. Who can dare say that their successors, who will be in office on March 8, 1963, will be as cooperative, much less cooperative at all?

While I might bleed with the majority for the downtrodden intervenors, who pleaded with the Court for a chance to do it themselves, I can only interpret what they may have in their minds by their past acts in challenging not only the Supreme Court of Oklahoma, but also more than 200,000 residents of Oklahoma who signed an Initiative Petition, the State Election Board, and everyone else who has attempted to get them to discharge their constitutional duty with honor and fidelity.

I respectfully dissent.