Archie L. LISCO, and all other registered voters of the Denver Metropolitan Area, State of Colorado, similarly situated, Plaintiffs,

v.

John LOVE, as Governor of the State of Colorado, Homer Bedford, as Treasurer of the State of Colorado, Byron Anderson, as Secretary of the State of Colorado, the State of Colorado and the Forty-Fourth General Assembly thereof, Defendants.

William E. MYRICK et al., Plaintiffs,

v.

The FORTY–FOURTH GENERAL ASSEMBLY of the State of Colorado, John Love, as Governor of the State of Colorado, Homer Bedford, as Treasurer of the State of Colorado, and Byron Anderson, as Secretary of State of the State of Colorado, Defendants,

Edwin C. Johnson, John C. Vivian, Joseph F. Little, Warwick Downing, and Wilbur M. Alter, individually and as citizens, residents and taxpayers of the State of Colorado, on behalf of themselves and for all persons similarly situated, Intervenors.

Civ. A. Nos. 7501, 7637.

United States District Court
D. Colorado.

July 16, 1963.

William E. Doyle, District Judge, dissented.

Francis R. Salazar and Carl Harthun, Denver, Colo., for plaintiffs in Civil Action No. 7501.

George Louis Creamer and Charles Ginsberg, Denver, Colo., for plaintiffs in Civil Action No. 7637.

Duke W. Dunbar, Atty. Gen., and Richard W. Bangert, Asst. Atty. Gen., Denver, Colo., Anthony F. Zarlengo and V. G. Seavy, Jr., Denver, Colo., for defendants in Civil Actions No. 7501 and No. 7637.

Richard S. Kitchen, Charles S. Vigil and J. Harley Williams, Jr., Denver, Colo., for intervenors in Civil Actions No. 7501 and No. 7637.

Philip J. Carosell, Denver, Colo., amicus curiae in Civil Actions No. 7501 and No. 7637.

Before BREITENSTEIN, Circuit Judge, and ARRAJ and DOYLE, District Judges.

BREITENSTEIN, Circuit Judge.

These consolidated actions attack the apportionment of the membership of the bicameral Colorado legislature. At the 1962 General Election, two initiated constitutional amendments were submitted

to the electorate. One, known as Amendment No. 7, provided for a House of Representatives with the membership apportioned on a per capita basis and for a Senate which was not so apportioned. The other, Amendment No. 8, apportioned both chambers on a per capita basis. Amendment No. 7 carried in every county of the state and Amendment No. 8 lost in every county.[1] The contest over the conflicting theories presented by these two proposals has now shifted from the political arena to the court. The issue is whether the Federal Constitution requires that each house of a bicameral state legislature be apportioned on a per capita basis.

The plaintiffs are residents, taxpayers, and qualified voters within the Denver Metropolitan Area. The defendants are various state officials[2] and the Colorado General Assembly. The complaints as originally filed on March 28 and July 9, 1962, respectively, challenged the apportionment of legislative membership under the then existing constitutional and statutory provisions. Because the suits presented substantial questions as to the constitutionality of state statutes and sought injunctive relief, a three-judge court was convened under 28 U.S.C. § 2281. The proponents of Amendment No. 7, which had then been submitted to the Colorado Secretary of State for inclusion on the ballot at the 1962 General Election, were permitted to intervene.[3]

On August 10, 1962, after trial, the court held[4] that it had jurisdiction, that the plaintiffs had capacity to sue, that the evidence established disparities in apportionment "of sufficient magnitude to make out a *prima facie* case of invidious discrimination," and that the defendants had shown no rational basis for the disparities. The court noted that the aforementioned initiated constitutional amendments would be on the ballot at the ensuing General Election, declined to enjoin the forthcoming primary election and to devise a plan of apportionment, and continued the cases until after the General Election. Following the approval by the electorate of Amendment No. 7, the plaintiffs amended their complaints to assert that Amendment No. 7 violates the Fourteenth Amendment to the United States Constitution by apportioning the Senate on a basis other than population and that, as the provisions of Amendment No. 7 are not severable, the entire amendment is invalid. In answering the amended complaints, the defendants renewed their jurisdictional objections and asserted the constitutionality of Amendment No. 7.

We are convinced that the allegations of the complaints are sufficient to establish federal jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983, and that the plaintiffs have standing to sue.[5] The relief sought is a declaration that Amendment No. 7 is void, that the theretofore existing statutory apportionment is void, and that the court fashion appropriate injunctive relief to assure equality in voting rights. Although the prime attack is now against a provision of the state constitution rather than a state statute, the necessity of adjudication by a three-judge district court is still present.[6]

The Colorado legislature met in January, 1963, and passed a statute, H.B. No. 65, implementing Amendment No. 7.

1. See footnote 32, infra.

2. Since the suits were filed, the incumbents of these offices have changed. An appropriate order of substitution has heretofore been made under Rule 25(d), F.R.Civ.P.

3. Four of the intervenors are residents, taxpayers, and qualified voters of the counties within the Denver Metropolitan Area and the other of Moffat County. One intervenor was a nonprofit corporation and it has been heretofore dismissed from the case on the ground of a lack of capacity to sue.

4. See Lisco v. McNichols, D.C.Colo., 208 F.Supp. 471, 478.

5. Baker v. Carr, 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663.

6. See American Federation of Labor v. Watson, Attorney General, 327 U.S. 582, 592–593, 66 S.Ct. 761, 90 L.Ed. 873, and Sincock v. Duffy, D.C.Del., 215 F.Supp. 169, 171–172.

No question is raised concerning the implementing legislation.

Amendment No. 7 [7] created a General Assembly composed of a Senate of 39 members and a House of Representatives of 65 members. The state is divided into 65 representative districts "which shall be as nearly equal in population as may be" with one representative to be elected from each district. The state is also divided into 39 senatorial districts, 14 of which include more than one county. In counties apportioned more than one senator, senatorial districts are provided which "shall be as nearly equal in population as may be." Mandatory provisions require the revision of representative districts and of senatorial districts within counties apportioned more than one senator after each Federal Census.

The defeated Amendment No. 8 [8] proposed a three-man commission to apportion the legislature periodically. The commission was to have the duty of delineating, revising and adjusting senatorial and representative districts. Its actions were to be reviewed by the Colorado Supreme Court. The districting was to be on a strict population ratio for both the Senate and the House with limited permissible variations therefrom.

The record presents no dispute over the material and pertinent facts. The parties disagree as to the conclusions to be drawn from these facts. The plaintiffs rely entirely on statistics said to show that population disparities among the senatorial districts result in over-representation of rural areas. The defendants and intervenors assert that the senatorial districts, and the apportionment of senators thereto, have a rational basis and violate no provisions of the Federal Constitution.

The prime position of the plaintiffs is that representation in proportion to population is the fundamental standard commanded by the Federal Constitution. They say that this standard requires that each house must be made up of members representing substantially the same number of people.

The principle of equal weight for each vote is satisfied by a system under which all members of the legislature are elected at large. Such system would result in absolute majority rule and would effectively deny representation to minority interests. Although it would assure no dilution of the weight of any individual's vote, it presents the danger of dilution of the representative and deliberative quality of a legislature because of the practical difficulties of intelligent choice by the voters and because of the hazard of one-party domination.

The disadvantages of elections at large are overcome by the principle of districting. This principle provides representation to interests which otherwise would be submerged by the majorities in larger groups of voters.

From the very beginning of our Nation, districting has been used at all levels of government—national, state and local.[9] The application of the districting principle to a state legislature requires the division of the state into geographical areas and the apportionment of a certain number of members of the legislature to each district. The plaintiffs say that the district boundaries must be so drawn, and the apportionment to each so made, that the result is substantial equality in the number of people represented by each member of each chamber of the legislature. The query is whether this is required by the Federal Constitution.

7. See Appendix A following this opinion.

8. See Appendix B following this opinion.

9. As said by Neal in his article, "Baker v. Carr: Politics in Search of Law," published in the 1962 Supreme Court Review, 252, 277; " * * * the princi- ple of districting within each such unit reflects our conviction that the general interest, and the innumerable separate interests of which it is composed, will be better expressed in a medley of voices from minor fractions of the population than by any monolithic majority."

Baker v. Carr sets up no standards for the apportionment of a state legislature. That decision rejects the Guaranty Clause [10] as a basis for judicial action in such cases and speaks in terms of the Equal Protection Clause of the Fourteenth Amendment with overtones of the Due Process Clause. The application of these principles causes us difficulty. If we are concerned with equal protection, the question arises as to what laws we consider when evaluating the equality of protection. In Baker v. Carr a noncompliance with state constitutional provisions was present. We have no need to consider whether deliberate departure from state law denies equal protection [11] because here we are dealing with the state constitution itself and the attacked provisions fall only if they impinge on the Federal Constitution.

We are not concerned here with racial discriminations forbidden by the Fourteenth and Fifteenth Amendments or with discrimination on the ground of sex in violation of the Nineteenth Amendment. If we reject the republican form of government standard as a basis for judicial action, we are left with the Due Process Clause to support an assertion of denial of equal protection upon the theory that unequal representation denies equal protection because minority process is not due process.[12]

■ For all practical purposes the Supreme Court has foregone the application of the Due Process Clause in substantive matters unless an impingement on some absolute civil right occurs.[13] Although the right of franchise is "a fundamental political right, because preservative of all rights," [14] no provision of the Federal Constitution of which we are aware makes it an absolute right or forbids apportionment of a state legislature on a basis other than one-man, one-vote. Baker v. Carr speaks in terms of "rationality" and "invidious discrimination." The use of these terms precludes the existence of an absolute right.

If either the Equal Protection Clause or the Due Process Clause or both require absolute majority action, some drastic governmental changes will be necessary. "Every device that limits the power of a majority is, in effect, a means of giving disproportionate representation to the minority."[15] The problem is compounded in the situation with which we are concerned. With full operation of the one-man, one-vote principle, the Colorado electorate by an overwhelming majority approved a constitutional amendment creating a Senate, the membership of which is not apportioned on a strict population basis. By majority process the voters have said that minority process in the Senate is what they want. A rejection of their choice is a denial of the will of the majority. If the majority becomes dissatisfied with that which it has created, it can make a

---

10. U.S.Const. Art. IV, § 4.

11. See Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497.

12. Dixon, "Legislative Apportionment and the Federal Constitution," Law and Contemporary Problems, Vol. XXVII, No. 3, 329, 383.

13. See Ferguson, Attorney General of Kansas, v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, wherein the Court refers to the abandonment of the use of the Due Process Clause "to nullify laws which a majority of the Court believed to be economically unwise."

14. Yick Wo v. Hopkins, Sheriff, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220.

15. Quoted from Neal, supra, p. 281. Neal says further: "A constitutional principle that puts unequal districting in doubt also calls into question, by necessary implication, provisions requiring special majorities for particular kinds of legislation, such as approval of bond issues in municipal referenda or adoption of proposed constitutional amendments by legislatures or passage of legislation over an executive veto. Why should it not reach, as well, other procedural rules or devices that give obstructive power to minorities, such as the filibuster or the seniority system for choosing committee chairmen?"

change at an election in which each vote counts the same as every other vote.

A test for determination of equal protection in apportionment cases might logically be better based on the concept of a republican form of government than on the uncertainties, vagueness, and subjective implications of due process. Whichever route is taken the journey ends at the same destination, the necessity of deciding whether the Federal Constitution requires equality of population within representation districts for each house of a bicameral state legislature. We believe that the question must be answered in the negative.

The concept of equality of representation is without historical support.[16] Supreme Court precedents indicate that it is not required.[17] Four, and perhaps five, of the Justices sitting in Baker v. Carr reject the idea.[18] A heavy majority of the state and lower federal courts has declined to accept the "practical equality standard" as a requirement inherent in the Equal Protection Clause.[19] By the

16. See the historical material in the dissent of Justice Frankfurter in Baker v. Carr, 369 U.S. 186, at 301–324, 82 S.Ct. 691 at 755–768, 7 L.Ed.2d 663, and the opinion of Judge Edwards in Scholle v. Hare, 360 Mich. 1, at 85, 104 N.W.2d 63, at 107, vacated and remanded 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1, on remand 367 Mich. 176, 116 N.W.2d 350, petition for certiorari filed October 15, 1962, 31 Law Week 3147.

17. E. g. MacDougall v. Green, Governor of Illinois, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, where the Court said: "To assume that political power is a function exclusively of numbers is to disregard the practicalities of government." (335 U.S. p. 283, 69 S.Ct. p. 2) In Norvell v. State of Illinois, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456, a case relating to the right of an indigent to a trial transcript at state expense, the Court, after quoting from Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730, a statement that the problems of government are practical ones which may justify if not require rough accommodations, said: "The 'rough accommodations' made by government do not violate the Equal Protection Clause of the Fourteenth Amendment unless the lines drawn are 'hostile or invidious.'"

18. See concurring opinion of Justice Clark, 369 U.S. 186 at p. 252, 82 S.Ct. 691 at p. 728, concurring opinion of Justice Stewart at pp. 265–266, of 369 U.S., p. 736–737 of 82 S.Ct., and separate dissenting opinions of Justices Frankfurter and Harlan. Justice Douglas said in his concurring opinion at pp. 244–245 of 369 U.S., p. 724 of 83 S.Ct.: "Universal equality is not the test; there is room for weighting."

19. Sobel v. Adams, S.D.Fla., 208 F.Supp. 316, 321, 323, Id., D.C., 214 F.Supp. 811; Thigpen v. Meyers, W.D.Wash., 211 F.

Supp. 826, 831; Sims v. Frink, M.D. Ala., 205 F.Supp. 245, Id., D.C., 208 F.Supp. 431, 439, probable jurisdiction noted June 10, 1963, Reynolds v. Sims, 374 U.S. 802, 83 S.Ct. 1692, 10 L.Ed.2d 1029; W. M. C. A., Inc., v. Simon, S.D. N.Y., 208 F.Supp. 368, 379, probable jurisdiction noted June 10, 1963, 374 U.S. 802, 83 S.Ct. 1691, 10 L.Ed.2d 1028; Baker v. Carr, M.D.Tenn., 206 F.Supp. 341, 345; Mann v. Davis, E.D.Va., 213 F.Supp. 577, 584, probable jurisdiction noted June 10, 1963, 374 U.S. 803, 83 S.Ct. 1692, 10 L.Ed.2d 1029; Toombs v. Fortson, N.D.Ga., 205 F.Supp. 248, 257; Davis v. Synhorst, S.D.Iowa, 217 F.Supp. 492; Nolan v. Rhodes, S.D.Ohio, 218 F.Supp. 953; Lund v. Mathas, 145 So.2d 871, 873 (Fla.); Caesar v. Williams, 84 Idaho 254, 371 P.2d 241, 247–249; Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 180 A.2d 656, 667–669; Id., Md., 182 A.2d 877, Id., 229 Md. 406, 184 A.2d 715, 718, probable jurisdiction noted June 10, 1963, 374 U.S. 804, 83 S.Ct. 1691, 10 L.Ed.2d 1029; Levitt v. Maynard, 182 A.2d 897 (N.H.); Jackman v. Bodine, 78 N.J.Super. 414, 188 A.2d 642, 651; Sweeney v. Notte, 183 A.2d 296, 301–302 (R.I.); and Mikell v. Rousseau, 123 Vt. 139, 183 A.2d 817 (Vt.).

See Israel, "The Future of Baker v. Carr," 61 Mich.L.Rev. 107, 117, which notes as exceptions to the majority rule only Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350, petition for certiorari filed, 31 Law Week 3147 (Oct. 15, 1962), and Moss v. Burkhart, W.D.Okl., 207 F.Supp. 885, appeal dismissed Baldwin v. Moss, 374 U.S. 93, 83 S.Ct. 1687, 10 L.Ed.2d 1026, June 10, 1963. The inclusion of Moss v. Burkhart as an exception is of doubtful propriety because the court there was concerned with specific provisions of the Oklahoma constitution. Sincock v. Duffy, D.Del., 215 F.Supp. 169, presented a question of severability and the peculiar

admission of states into the Union with constitutions creating bicameral legislatures, membership to which is not apportioned on a population basis, Congress has rejected the principle of equal representation as a constitutional requirement.[20] The decision in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, is not contrary because there the Court was not concerned with any limitation on "the authority of a State Legislature in designing the geographical districts from which representatives are chosen * * * for the State Legislature * * *."[21] The references in Gray v. Sanders to one-person, one-vote are not pertinent because the Court was considering an electoral system whereby votes for officers elected from a statewide constituency were weighted differently.

Our conclusion that nothing in the Constitution of the United States requires a state legislature to be apportioned on a strict population basis does not dispose of the problem. The issue remains as to the permissible deviation from a per capita basis. Speaking in terms long applicable to equal protection cases, the Court suggested in Baker v. Carr that an apportionment of membership in a state legislature must be "rational" and not "invidiously discriminatory." The issue is narrowed in the cases at bar because, under Amendment No. 7, the lower chamber of the Colorado legislature is apportioned on a population basis. The question is the effect of the failure to apportion the upper chamber on the same basis. A discussion of this matter necessitates a return to the facts.

The cases now before the court do not present the issues as they existed prior to the apportionment made by Amendment No. 7. As noted by our

opinion in Lisco v. McNichols, D.C., 208 F.Supp. 471, 477, the then-existing disparities in each chamber were severe, the defendants presented no evidence to sustain the rationality of the apportionment, and witnesses for the intervenors, while defending the apportionment of the Senate, recognized the malapportionment of the House. The change by Amendment No. 7 was such as to require a trial de novo and we are concerned with the facts as finally presented.

In Colorado the problem of districting the state for the election of members of the legislature and of apportioning legislators to those districts requires consideration of the state's heterogeneous characteristics. The politically determined boundaries of Colorado created a state which is not an economically or geographically homogeneous unit. The topography of the state is probably the most significant contributor to the diversity.

Colorado has an area of 104,247 square miles which is almost equally divided between high plains in the east and rugged mountains in the west. It has an average altitude of 6800 feet above sea level and some 1500 peaks which rise to 10,000 feet or more. The Continental Divide crosses the state in a meandering line from north to south.

In the eastern half of the state are high plains crossed by two major river systems, the South Platte and the Arkansas. The western half is a mountainous area drained principally by the Rio Grande and by the Colorado River and its tributaries. Major mountain ranges lie east of the Continental Divide in some sections of the state and have foothill areas of varying breadth separating the high peaks from the high plains.

factual situation in Delaware. The majority of the court said that the House must be based strictly on population and the Senate "substantially on population." 215 F.Supp. at 195.

20. The constitutions of Alaska and Hawaii do not require equality of representation in each chamber of the legislature. In admitting these states Congress found the constitution of each "to be republican

in form and in conformity with the Constitution of the United States and the principles of the Declaration of Independence." See Act of July 7, 1958, 72 Stat. 339, and Act of March 18, 1959, 73 Stat. 4.

21. 372 U.S. 368, 376, 83 S.Ct. 801, 806, and see concurring opinion of Justice Stewart at pp. 381–382, of 372 U.S., p. 809 of 83 S.Ct.

Geographically the state is divided into many regions with transportation difficulties of varying severity. The high plains are crossed from east to west by several railroads and main highways. The only north to south rail system and main highway system in this area lie just east of the foothills. The western part of the state is separated into many segments by mountain ranges and deep canyons. One main-line railroad crosses this section from east to west and none from north to south. Four principal highways provide east to west transportation by crossing the ranges at passes having altitudes of 9,000 to 12,000 feet. The north to south highways are less adequate and follow indirect routes. The terrain of the western section is such that some communities only a few miles apart on the map are many miles apart by the shortest useable road. Commercial air transportation between other than the metropolitan centers is limited.

Colorado is further divided by the availability of water supply. The state is largely semi-arid with only isolated mountain areas having an annual precipitation of over 20 inches. That part of Colorado west of the Continental Divide has 37% of the total state land area and 69% of the state's surface water yield. The part east of the Continental Divide has 63% of the land area and 31% of the surface water supplies.[22] Conflicts over the use of water have troubled the state continuously since its admission to the Union. The growth of the metropolitan areas would have been impossible without the transmountain diversion of water from the Colorado River and its tributaries. The divisive nature of the

problem and the need for a state-wide water policy resulted in the creation of the Colorado Water Conservation Board,[23] the members of which are chosen geographically by drainage basins. This recognition of the diverse interests of the competing areas has enabled Colorado to develop impressive irrigation and hydroelectric power projects.[24]

The 1960 Federal Census gave Colorado a population of 1,753,947 persons. The population is concentrated heavily along the eastern edge of the foothills from Fort Collins on the north to Pueblo on the south. In this relatively narrow strip are located three Standard Metropolitan Statistical Areas as defined by the Census Bureau.[25]

The metropolitan areas and their populations are: Denver (Adams, Arapahoe, Boulder, Denver and Jefferson Counties) —929,383; Colorado Springs (El Paso County)—143,742; Pueblo (Pueblo County)—118,707.

Expert research economists testifying for the defendants divided the state into four regions, Western, Eastern, South Central and East Slope. The Western Region includes those counties west of the Continental Divide and those east of the Divide and entirely within the Front Range of mountains. The area is largely mountainous with wide fluctuations in elevation, precipitation and temperature. About two-thirds of the population live in communities of less than 2,500 inhabitants or on farms. Over 65% of the area is in some form of government ownership. The major industries are agriculture (principally livestock raising), mining, and tourism.

22. Colorado Year Book, 1959–1961, p. 451.

23. Colo.Rev.Stat.Ann., 1953, §§ 148–1–1 to 148–1–19.

24. Colorado Year Book, supra, pp. 459–462.

25. So far as pertinent the Census Bureau defines a Standard Metropolitan Statistical Area as: "a county or group of contiguous counties which contains at least one city of 50,000 inhabitants or more or 'twin cities' with a combined population of at least 50,000. In addition

to the county, or counties, containing such a city or cities, contiguous counties are included in an SMSA if, according to certain criteria, they are essentially metropolitan in character and are socially and economically integrated with the central city. The criteria followed in the delineation of SMSA's relate to a city, or cities, of sufficient population size to constitute the central city and to the economic and social relationships with contiguous counties that are metropolitan in character."

The Eastern Region is a part of the Great Plains. The area is dominated by agriculture with winter wheat the principal crop. Irrigation in the South Platte and Arkansas Valleys produces specialized crops. Livestock raising and feeding are important activities. There is some oil production.

The South Central Region includes Huerfano and Las Animas Counties and the six counties drained by the Rio Grande. Agriculture (principally potato raising and livestock) and coal mining are the main industries.

The East Slope Region includes the strip of counties from Larimer and Weld on the north through Pueblo on the south. The population is highly urbanized with 86.7% living in urban areas. The economy is diversified with manufacturing, agricultural production, mining, tourism, and trade and services contributing to the wealth of the area.

The state is divided into 63 counties, the boundaries of which have remained substantially unchanged since 1913. Historically, contiguous counties have been grouped into representation districts in accordance with a general pattern which is distinguishable since the early days of statehood. Geographical divisions such as mountain ranges and river basins, accessibility, homogeneity, and population all have been recognized. The apportionment of membership to the districts has varied with shifts in population. In the early days of statehood the mining counties were heavily populated. After the turn of the century the increased population of the agricultural counties in the high plains and the decline of the mining counties required changes in apportionment. In more recent years the growth of metropolitan areas has caused a demand for greater representation of the urban centers in the legislature.

Apportionment of the Colorado legislature has not remained static. Legislative revisions occurred in 1881, 1891, 1901, 1909, 1913, and 1953. In 1910, Colorado adopted a liberal constitutional provision for the initiative and referendum of both "laws and amendments to the constitution." [26] An initiated reapportionment law was adopted in 1932.[27] At its next session the legislature passed its own reapportionment law and the conflict between it and the initiated measure went to the Colorado Supreme Court,[28] which upheld the power of the people to adopt the initiated reapportionment measure, sustained the validity of the initiated reapportionment, and declared the legislative act unconstitutional. In 1954 the voters rejected a referred apportionment measure and in 1956 rejected an initiated constitutional amendment proposing the reapportionment of both chambers of the legislature on a straight population basis.[29]

After the defeat of the 1956 proposal the Governor appointed a commission to study reapportionment. The majority favored action similar to Amendment No. 7 and the minority recommended action substantially the same as the 1956 proposal and Amendment No. 8. Attempts of the legislature to agree on a reapportionment measure failed. An effort to compel apportionment by state court action failed.[30] During the spring of 1962 Amendments 7 and 8 were initiated by petition. Intensive campaigns were waged in support of each.[31] The voters

---

26. Colo.Const. Art. V, § 1. A constitutional amendment may be initiated by petition of 8% of the legal voters. No geographical distribution of petition signers is required.

27. Colo.S.L.1933, Ch. 157, p. 811.

28. Armstrong v. Mitten, 95 Colo. 425, 37 P.2d 757.

29. The vote in 1954 was 159,188 against and 116,695 for. The proposal lost in every county. The vote in 1956 was 349,- 195 against and 158,204 for. The proposal lost in every county except Denver.

30. In re Legislative Reapportionment, Colo., 374 P.2d 66.

31. The witness Edwin C. Johnson, three times Governor and three times United States Senator from Colorado, was one of the sponsors of Amendment No. 7. After mentioning the fact that No. 7 carried in every county and No. 8 lost in every county, he said: "It is very unusual in the annals of Colorado politics

adopted Amendment No. 7 and rejected Amendment No. 8.[32]

The choice of the voters is now before the court. By their action they have apportioned the House on a population basis and have recognized other factors in the apportionment of the Senate. Consideration must next be given to the deviations from equality of representation which occur in the apportionment of the Senate.

Appendix C following this opinion contains tables giving, for each of the four regions delineated by the defense experts, the senatorial apportionment under Amendment No. 7, listing constituent counties, the area in square miles, the population, the apportionment of senators and the population per senator.

The tables disclose that in the Western Region there are eight senatorial districts to which are apportioned eight senators. This region has 13% of the state population, 45.47% of the state area and 20.5% of the senators. There is one senator for each 28,480 persons.

The Eastern Region contains five senatorial districts, to which are apportioned five senators. The region has 8.1% of the state population, 26.21% of the state area and 12.8% of the senators. There is one senator for each 28,407 persons.

The South Central Region contains three senatorial districts, to which are apportioned three senators. The region has 3.8% of the state population, 13.99% of the state area and 7.7% of the Senate

membership. There is one senator for each 22,185 persons.

The East Slope Region contains twenty-three senatorial districts, to which are apportioned twenty-three senators. The region has 75.1% of the state population, 14.33% of the state area, and 59.0% of the Senate membership. There is one senator for each 57,283 persons.

The three metropolitan areas of the state have a combined population of 1,191,832 persons or 67.95% of the state total and elect twenty or a majority of the thirty-nine senators. The Denver Metropolitan Area has a population of 929,383 persons or 52.99% of the state total and elects sixteen senators. The City and County of Denver, the central portion of the Denver Metropolitan Area, is allotted eight senators. The suburban portion (Adams, Arapahoe, Boulder, and Jefferson Counties) of the same area is allotted a total of eight senators.

The combination of districts which would result in the election of a majority of the Senate by the smallest population is reached by taking Boulder County out of the Denver Metropolitan Area and adding it to the nonmetropolitan areas. This would result in a population of 636,369 persons or 36.28% of the state total electing a majority of the Senate.

Appendix D to this opinion gives the ratio of the population per senator in each district to the population of the district having the least number of persons represented by a senator. The highest ratio, that of Districts Nos. 11 and 12 over District No. 23, is 3.6 to 1.

that any proposal or candidate receive a plurality in each and every county of this diverse state. Especially as to ballot proposals, there is normally a large built-in negative vote. If people do not understand a proposal, they vote 'no'. I believe that the principal reason for the character of the vote on Amendment 7 is that the issues were very clearly defined, not only by the continuous activities above described from 1953 through 1962, but also in the campaign itself. The proponents of each amendment were highly organized, and they conducted a campaign in every nook and crannie of the state. * * * In addition both proposals were heavily advertised, pro and con, and were the subject of front

page editorial treatments by the newspapers of the state. Every communication medium was filled with discussion of this issue for months prior to election day. In short, in these campaigns, the people were intensely interested, fully informed and voted accordingly."

32. Amendment No. 7 was adopted by a vote of 305,700 to 172,725 (63.89% for and 36.11% against), and carried in every county of the state. Amendment No. 8 lost by a vote of 311,749 to 149,822 (67.54% against and 32.46% for), and was defeated in every county of the state.

The heterogeneous characteristics of Colorado justify geographic districting for the election of the members of one chamber of the legislature. In no other way may representation be afforded to insular minorities. Without such districting the metropolitan areas could theoretically, and no doubt practically, dominate both chambers of the legislature.

■ The plaintiffs make much of the disparities in senatorial representation which vary downward from 3.6 to 1. They say that the deviations from per capita standards are impermissible. We do not agree. The distributive scheme of Amendment No. 7 may not be perfect but it does recognize the geographic diversities, the historic grouping of counties, and the accessibility of a candidate to the voters and of a senator to his constituents. The realities of topographic conditions with their resulting effect on population may not be ignored. For an example, if the contention of the plaintiffs was to be accepted, Colorado would have one senator for approximately every 45,000 persons. Two contiguous Western Region senatorial districts, Nos. 29 and 37, have a combined population of 51,675 persons inhabiting an area of 20,514 square miles.[33] The division of this area into two districts does not offend any constitutional provisions. Rather, it is a wise recognition of the practicalities of life. An analysis of the other senatorial districts in all the regions except the populous East Slope would merely emphasize the point.

We are convinced that the apportionment of the Senate by Amendment No. 7 recognizes population as a prime, but not controlling, factor and gives effect to such important considerations as geography, compactness and contiguity of territory, accessibility, observance of natural boundaries, conformity to historical divisions such as county lines and prior representation districts, and "a proper diffusion of political initiative as between a state's thinly populated counties and those having concentrated masses." [34]

The plaintiffs rest their cases on the argument that the apportionment of the Senate by Amendment No. 7 is arbitrary, invidiously discriminatory, and without any rationality. The voters of Colorado have themselves answered these charges. By adopting Amendment No. 7 and by rejecting Amendment No. 8, which proposed to apportion the legislature on a per capita basis, the electorate has made its choice between the conflicting principles.

■ The initiative gives the people of a state no power to adopt a constitutional amendment which violates the Federal Constitution. Amendment No. 7 is not valid just because the people voted for it. If the republican form of government principle is not a useable standard because it poses political rather than judicial questions, the observation is still pertinent that Amendment No. 7 does not offend such principle. If the true test is the denial of equal right to due process, we face the traditional and recognized criteria of equal protection. These are arbitrariness, discrimination, and lack of rationality. The actions of the electorate are material to the application of the criteria. The contention that the voters have discriminated against themselves appalls rather than convinces. Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary.

The electorate of every county from which the plaintiffs come preferred

33. Each of nine states, Rhode Island, Delaware, Connecticut, Hawaii, New Jersey, Massachusetts, New Hampshire, Vermont, and Maryland contains less area.

34. W. M. C. A., Inc., v. Simon, S.D.N.Y., 208 F.Supp. 368, 379, probable jurisdiction noted 374 U.S. 802, 83 S.Ct. 1691, 10 L.Ed.2d 1028, June 10, 1963. See also Mann v. Davis, E.D.Va., 213 F.Supp. 577, 584, probable jurisdiction noted, 374 U.S. 803, 83 S.Ct. 1692, 10 L.Ed.2d 1029, June 10, 1963.

Amendment No. 7. In the circumstances it is difficult to comprehend how the plaintiffs can sue to vindicate a public right. At the most they present a political issue which they lost. On the questions before us we shall not substitute any views which we may have for the decision of the electorate. In Ferguson, Attorney General of Kansas, v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, the Supreme Court said that it refused to sit as a "super-legislature to weigh the wisdom of legislation." [35] Similarly, we decline to act as a superelectorate to weigh the rationality of a method of legislative apportionment adopted by a decisive vote of the people.

We believe that no constitutional question arises as to the actual, substantive nature of apportionment if the popular will has expressed itself.[36] In Baker v. Carr the situation was such that an adequate expression of the popular view was impossible. In Colorado the liberal provisions for initiation of constitutional amendments permit the people to act—and they have done so. If they become dissatisfied with what they have done, a workable method of change is available. The people are free, within the framework of the Federal Constitution, to establish the governmental forms which they desire and when they have acted the courts should not enter the political wars to determine the rationality of such action.

Each case is dismissed and all parties shall bear their own costs. The Findings of Fact and Conclusions of Law of the court are set out in this opinion as permitted by Rule 52(a), F.R.Civ.P. The clerk will forthwith prepare and submit an appropriate form of judgment.

### APPENDIX A

INITIATED AMENDMENT No. 7—
1962 Colo. Gen. Election

"SECTION 1. Sections 45, 46, and 47 of Article V of the Constitution of the State of Colorado are hereby repealed and new Sections 45, 46, 47 and 48 of Article V are adopted, to read as follows:

"Section 45. GENERAL ASSEMBLY. The general assembly shall consist of 39 members of the senate and 65 members of the house, one to be elected from each senatorial and representative district. Districts of the same house shall not overlap. All districts shall be as compact as may be and shall consist of contiguous whole general election precincts. No part of one county shall be added to another county or part of another county in forming a district. When a district includes two or more counties they shall be contiguous.

"Section 46. HOUSE OF REPRESENTATIVES. The state shall be divided into 65 representative districts which shall be as nearly equal in population as may be.

"Section 47. SENATE. The state shall be divided into 39 senatorial districts. The apportionment of senators among the counties shall be the same as now provided by 63–1–3 of Colorado Revised Statutes 1953, which shall not be repealed or amended other than in numbering districts, except that the counties of Cheyenne, Elbert, Kiowa, Kit Carson and Lincoln shall form one district, and one additional senator is hereby apportioned to each of the counties of Adams, Arapahoe, Boulder and Jefferson. Within a county to which there is apportioned more than one senator, senatorial districts shall be as nearly equal in population as may be.

"Section 48. REVISION OF DISTRICTS. At the regular session of the general assembly of 1963 and each regular session next following official publication of each Federal enumeration of the population of the state, the general assembly shall immediately alter and amend the boundaries of all representative districts and of those senatorial districts within any county to which there is apportioned more than one senator to conform to the requirements of

---

35. Quoted from Day-Brite Lighting, Inc., v. Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469.

36. See McCloskey, "The Reapportionment Case," 76 Harvard Law Review 54, 71–72.

Sections 45, 46 and 47 of this Article V. After 45 days from the beginning of each such regular session, no member of the general assembly shall be entitled to or earn any compensation or receive any payments on account of salary or expenses, and the members of any general assembly shall be ineligible for election to succeed themselves in office, until such revisions have been made. Until the completion of the terms of the representatives elected at the general election held in November of 1962 shall have expired, the apportionment of senators and representatives and the senatorial and representative districts of the general assembly shall be as provided by law."

## APPENDIX B

### INITIATED AMENDMENT No. 8—
#### 1962 Colo. Gen. Election

Sections 45 and 47, Article V, of the Constitution of the State of Colorado, are hereby amended to read as follows:

"Section 45. APPORTIONMENT BY COMMISSION. (A) There shall be established a Commission for Legislative Apportionment composed of three members who shall be qualified electors of the State of Colorado, no more than two of whom shall be of the same political party, to serve for a term of eighteen months from the time of their appointment. One member shall be appointed by each of the following in this order: by the Attorney General prior to June 1, by the Lieutenant Governor prior to June 15 and by the State Board of Education prior to July 1, of each year of appointment. The appointments shall be made prior to July 1, 1963, July 1, 1971, and July 1 of each tenth year thereafter.

"(B) It shall be the duty of the commission to delineate senatorial and representative districts and to revise and adjust the apportionment of senators and representatives among such districts. The commission shall certify to the Colorado Supreme Court the boundaries of the senatorial and representative districts and the reapportionment of senators and representatives on or before January 2, 1964; January 2, 1972, and January 2 of each tenth year thereafter.

"(C) If such delineation and apportionment conforms to the requirements of sections 45 through 47 of this article, the court shall affirm the same. If such delineation and apportionment does not conform to the said requirements, or if for any reason whatever the same is not certified to the court, then the court shall delineate senatorial and representative districts and adjust the apportionment among such districts. The court shall rule on or before April 15 of each year set forth in paragraph (B) of this section, with such districting and apportionment to become effective on the date of the court's ruling. The court shall notify forthwith the secretary of state and the clerk of each county of its ruling.

"(D) The commission shall determine a strict population ratio for the senate and for the house by dividing the total state population as set forth in each decennial United States Census by the number of seats assigned to the senate and house, respectively. No legislative district shall contain a population per senator or representative of 33⅓% more or less than the strict population ratio, except mountainous senatorial districts of more than 5,500 square miles, where the major portion of the district lies west of the 28th meridian of longitude west from Washington, D. C., but no such senatorial district shall contain a population of less than 50% of the strict population ratio.

"(E) It is the intent that sparsely populated areas shall have maximum representation within the limits set forth in paragraph (D) and that population per legislator in densely populated areas shall be as nearly equal as possible.

"Section 47. SENATORIAL AND REPRESENTATIVE DISTRICTS. (A) Senatorial districts may consist of one county or two or more contiguous counties but no county shall be divided in the formation of a senatorial district.

"(B) Representative districts may consist of one county or two or more contiguous counties, except that any

county which is apportioned two or more representatives may be divided into representative sub-districts; Provided, that, a majority of the voters of that county approve in a general election the exact method of subdivision and the exact apportionment of representatives among the subdistricts and the county at large.

"(C) Any proposal to divide a county into subdistricts shall be placed on the ballot only by initiative petition filed with the secretary of state according to the requirements set forth for statewide initiated measures in Article V, Section 1, of this constitution and statutes enacted thereunder; Provided, that, the requirements for the number of signatures and publication shall be determined for that county instead of for the state.

"(D) Subdistricting measures may be placed on the ballot at the general elections of 1966, 1974, and at the general elections held each tenth year thereafter and at no other times. Any such measure shall take effect pursuant to the provisions of Article V, Section 1, of this constitution and shall remain in effect until repealed or revised by the people through another initiated measure, except that when the apportionment of representatives to any subdistricted county is increased or decreased by the commission for legislative apportionment, the commission may, subject to the review provided in Section 45, paragraph (C), of this article, amend the subdistricting in said county as necessary to conform to the new apportionment.

"(E) A candidate for representative in any subdistricted county need not reside in the subdistrict in which he is a candidate.

"(F) No part of any county may be combined with another county or part of another county in the formation of any senatorial or representative district."

## APPENDIX C
## APPORTIONMENT OF THE SENATE BY AMENDMENT NO. 7
### (Grouped by Regions)

| Sen.* Dists. | Counties | Square Miles | Population | | Senators | Population Per Senator |
|---|---|---|---|---|---|---|
| | | | WESTERN REGION | | | |
| 24 | Chaffee | 1,040 | 8,298 | | | |
| | Park | 2,178 | 1,822 | | | |
| | Gilpin | 149 | 685 | | | |
| | Clear Creek | 395 | 2,793 | | | |
| | Douglas** | 844 | 4,816 | | | |
| | Teller | 555 | 2,495 | | | |
| | | 5,161 | | 20,909 | 1 | 20,909 |
| 25 | Fremont | 1,562 | 20,196 | | | |
| | Custer | 738 | 1,305 | | | |
| | | 2,300 | | 21,501 | 1 | 21,501 |
| 27 | Delta | 1,161 | 15,602 | | | |
| | Gunnison | 3,243 | 5,477 | | | |
| | Hinsdale | 1,062 | 208 | | | |
| | | 5,466 | | 21,287 | 1 | 21,287 |
| 29 | Rio Blanco | 3,264 | 5,150 | | | |
| | Moffat | 4,761 | 7,061 | | | |
| | Routt | 2,331 | 5,900 | | | |
| | Jackson | 1,628 | 1,758 | | | |
| | Grand | 1,869 | 3,557 | | | |
| | | 13,853 | | 23,426 | 1 | 23,426 |

| Sen.* Dists. | Counties | Square Miles | Population | | Senators | Population Per Senator |
|---|---|---|---|---|---|---|
| | | | | WESTERN REGION—Continued | | |
| 32 | Mesa | | 3,334 | 50,715 | 1 | 50,715 |
| 33 | Montrose | 2,240 | 18,286 | | | |
| | Ouray | 540 | 1,601 | | | |
| | San Miguel | 1,284 | 2,944 | | | |
| | Dolores | 1,029 | 2,196 | | | |
| | | 5,093 | | 25,027 | 1 | 25,027 |
| 35 | San Juan | 392 | 849 | | | |
| | Montezuma | 2,097 | | 14,024 | | |
| | La Plata | 1,691 | 19,225 | | | |
| | Archuleta | 1,364 | 2,629 | | | |
| | | 5,544 | | 36,727 | 1 | 36,727 |
| 37 | Garfield | 3,000 | 12,017 | | | |
| | Summit | 616 | 2,073 | | | |
| | Eagle | 1,686 | 4,677 | | | |
| | Lake | 384 | 7,101 | | | |
| | Pitkin | 975 | 2,381 | | | |
| | | 6,661 | | 28,249 | 1 | 28,249 |
| | Western Region (8 Districts,) (30 Counties) | 47,412 | | 227,841 | 8 | 28,480 |
| | | | EASTERN REGION | | | |
| 28 | Logan | 1,849 | 20,302 | | | |
| | Sedgwick | 554 | 4,242 | | | |
| | Phillips | 680 | 4,440 | | | |
| | | 3,083 | | 28,984 | 1 | 28,984 |
| 34 | Kit Carson | 2,171 | 6,957 | | | |
| | Cheyenne | 1,772 | 2,789 | | | |
| | Lincoln | 2,593 | 5,310 | | | |
| | Kiowa | 1,794 | 2,425 | | | |
| | Elbert | 1,864 | 3,708 | | | |
| | | 10,194 | | 21,189 | 1 | 21,189 |
| 36 | Yuma | 2,383 | 8,912 | | | |
| | Washington | 2,530 | 6,625 | | | |
| | Morgan | 1,300 | 21,192 | | | |
| | | 6,213 | | 36,729 | 1 | 36,729 |
| 38 | Otero | 1,276 | 24,128 | | | |
| | Crowley | 812 | 3,978 | | | |
| | | 2,088 | | 28,106 | 1 | 28,106 |
| 39 | Bent | 1,543 | 7,419 | | | |
| | Prowers | 1,636 | 13,296 | | | |
| | Baca | 2,565 | 6,310 | | | |
| | | 5,744 | | 27,025 | 1 | 27,025 |
| | Eastern Region (5 Districts,) (16 Counties) | 27,322 | | 142,033 | 5 | 28,407 |

| Sen.* Dists. | Counties | Square Miles | Population | Senators | Population Per Senator |
|---|---|---|---|---|---|
| | | SOUTH CENTRAL REGION | | | |
| 23 | Las Animas | 4,798 | 19,983 | 1 | 19,983 |
| 30 | Huerfano | 1,580 | 7,867 | | |
| | Costilla | 1,220 | 4,219 | | |
| | Alamosa | 723 | 10,000 | | |
| | | 3,523 | 22,086 | 1 | 22,086 |
| 31 | Saguache | 3,146 | 4,473 | | |
| | Mineral | 923 | 424 | | |
| | Rio Grande | 916 | 11,160 | | |
| | Conejos | 1,274 | 8,428 | | |
| | | 6,259 | 24,485 | 1 | 24,485 |
| | South Central (3 Districts,) (8 Counties) | 14,580 | 66,554 | 3 | 22,185 |
| | | EAST SLOPE REGION | | | |
| 1–8 | Denver | 73 | 493,887 | 8 | 61,736 |
| 9–10 | Pueblo | 2,414 | 118,707 | 2 | 59,353 |
| 11–12 | El Paso | 2,159 | 143,742 | 2 | 71,871 |
| 13–14 | Boulder | 758 | 74,254 | 2 | 37,127 |
| 15–16 | Weld | 4,033 | 72,344 | 2 | 36,172 |
| 21–22 | Jefferson | 791 | 127,520 | 2 | 63,760 |
| 26 | Larimer | 2,640 | 53,343 | 1 | 53,343 |
| 19–20 | Arapahoe | 815 | 113,426 | 2 | 56,713 |
| 17–18 | Adams | 1,250 | 120,296 | 2 | 60,148 |
| | East Slope (23 Districts,) ( 9 Counties ) | 14,933 | 1,317,519 | 23 | 57,283 |

* The districts are numbered as in H.B. 65. Before the adoption of Amendment No. 7, the state was divided into 25 senatorial districts by Colo.Rev.Stat.Ann. § 63-1-3 (1953), and 35 senators were apportioned to those districts. Amendment No. 7 retained the same district boundaries except that Elbert County was removed from the district which included Arapahoe County also and was added to the district previously consisting of Kit Carson, Cheyenne, Lincoln, and Kiowa Counties. Arapahoe was left in a district by itself. The membership in the Senate was increased to 39 by apportioning one additional senator each to the suburban counties of the Denver Metropolitan Area, that is, Adams, Arapahoe, Boulder and Jefferson Counties. Counties apportioned more than one senator were to be divided by the legislature into senatorial districts as nearly equal as may be in population. This division was made by H.B. 65. The action so taken is not at issue in these cases.

** Douglas County is a part of the East Slope Region, but because of its peculiarities is joined with five Western Region counties to form a senatorial district.

| Areas | Square Miles | Population | Senators | Population Per Senator |
|---|---|---|---|---|
| Colorado (39 Districts,) (63 Counties ) | 104,247 | 1,753,947 | 39 | 44,973 |
| Denver Metropolitan Area (Denver, Boulder, Jefferson, Arapahoe and Adams Counties) (16 Districts,) ( 5 Counties ) | 3,687 | 929,383 | 16 | 58,086 |
| All Standard Metropolitan Statistical Areas ("Denver" — Adams, Arapahoe, Boulder, Denver and Jefferson Counties; "Colorado Springs" — El Paso County; and "Pueblo" — Pueblo County) (20 Districts) ( 7 Counties ) | 8,260 | 1,191,832 | 20 | 59,592 |

## APPENDIX D

### RATIO OF POPULATION PER SENATOR IN EACH DISTRICT TO THE POPULATION OF THE DISTRICT HAVING THE LEAST NUMBER OF PERSONS REPRESENTED BY A SENATOR

(Grouped by Regions)

| District | Population Per Senator | Least Population Per Senator | Ratio |
|---|---|---|---|
| WESTERN REGION | | | |
| 24 | 20,909 | 19,983 | 1.0–1 |
| 25 | 21,501 | 19,983 | 1.1–1 |
| 27 | 21,287 | 19,983 | 1.1–1 |
| 29 | 23,426 | 19,983 | 1.2–1 |
| 32 | 50,715 | 19,983 | 2.5–1 |
| 33 | 25,027 | 19,983 | 1.3–1 |
| 35 | 36,727 | 19,983 | 1.8–1 |
| 37 | 28,249 | 19,983 | 1.4–1 |
| EASTERN REGION | | | |
| 28 | 28,984 | 19,983 | 1.5–1 |
| 34 | 21,189 | 19,983 | 1.1–1 |
| 36 | 36,729 | 19,983 | 1.8–1 |
| 38 | 28,106 | 19,983 | 1.4–1 |
| 39 | 27,025 | 19,983 | 1.4–1 |
| SOUTH CENTRAL REGION | | | |
| 23 | 19,983 | 19,983 | 1–1 |
| 30 | 22,086 | 19,983 | 1.1–1 |
| 31 | 24,485 | 19,983 | 1.2–1 |
| EAST SLOPE REGION | | | |
| 1–8 | 61,736 | 19,983 | 3.1–1 |
| 9–10 | 59,353 | 19,983 | 3.0–1 |
| 11–12 | 71,871 | 19,983 | 3.6–1 |
| 13–14 | 37,127 | 19,983 | 1.9–1 |
| 15–16 | 36,172 | 19,983 | 1.8–1 |
| 21–22 | 63,760 | 19,983 | 3.2–1 |
| 26 | 53,343 | 19,983 | 2.7–1 |
| 19–20 | 56,713 | 19,983 | 2.8–1 |
| 17–18 | 60,148 | 19,983 | 3.0–1 |

———◆———

DOYLE, District Judge (dissenting).

Our concern here is not with the desirability as a matter of policy of a Senate which is controlled by a minority of voters, nor are we concerned with the extent of voter approval which resulted in adoption of Amendment No. 7. The issue for determination is whether the disparities described in the majority opinion, which will be further discussed here, are so substantial and irrational as to constitute invidious discrimination so

as to violate the equal protection of the laws, Fourteenth Amendment of the Constitution of the United States.

Prior to the adoption of Amendment No. 7, and on August 10, 1962, this Court issued its per curiam opinion recognizing the equal protection clause as the criterion, finding gross disparities and holding the disparities to be of sufficient magnitude to make out a *prima facie* case of invidious discrimination. At the same time final adjudication was postponed pending a further hearing and because of the impendency of the election at which the competing measures were on the ballot. Subsequently, Amendment No. 7 was approved by a majority of the voters of the State. And so, the question is whether the gross disparities—invidious discrimination, was remedied by the adoption of Amendment No. 7; or whether the evidence at the trial showed the existence of a rational basis whereby the discriminations were no longer to be regarded as invidious.

Does Amendment No. 7 remedy the gross and glaring disparity in voting strength which is described and characterized in our prior opinion? Amendment No. 7 provides for a House of Representatives composed of sixty-five members from sixty-five districts which shall be as nearly equal in population as may be. This provision removed the population disparities which existed in the House of Representatives under the old law.[1]

In the Senate, Amendment No. 7 declares that the State shall be divided into thirty-nine senatorial districts, one senator from each district. It further declares that the apportionment of senators among the counties shall be the same as now provided by 63–1–3, Colorado Revised Statutes 1953. Four senators are added, or a total of thirty-nine, as compared with thirty-five under the old law, and one each of these additional senators is apportioned to Adams, Arapahoe, Boulder and Jefferson counties. Further, the amendment freezes the apportionment of the various districts except for a provision permitting a review of counties apportioned more than one senator following each federal census. It is thus apparent then that Amendment No. 7, while apportioning the House on a population basis, retains the old system, that which we previously condemned, except that it gives a senator for each of four populous metropolitan counties. It is clear, therefore, that no real effort has been made to cure the disparities which existed under the old law; on the contrary, these disparities are perpetuated by writing them into the Constitution of Colorado, the only relief being somewhat of a reduction of disparity in four of the sixty-three counties in the State.

The ultimate question is, therefore, the second one posed above, which is, whether the defendants and respondents have offered evidence establishing that the disparities are non-invidious.

Although a number of federal courts have now indicated that at least one house must be apportioned on a per capita basis,[2] there is little authority holding that the upper house may or may not be organized upon a wide disparity of population basis.[3] It would appear that there is no logical basis for distinguishing between the lower and the upper house—that the equal protection clause applies to both since no valid analogy can be drawn between the United

1. 63–1–2, 63–1–6, Colorado Revised Statutes 1953.

2. Toombs v. Fortson, (D.C.N.D.Ga., 1962) 205 F.Supp. 248; Baker v. Carr, (D.C. M.D.Tenn., 1962) 206 F.Supp. 341; Sims v. Frink, (D.C.M.D.Ala., N.D.1962) 205 F.Supp. 245; Caesar v. Williams, (1962) 84 Idaho 254, 371 P.2d 241; Sincock v. Duffy, (D.C.D.Del., 1963) 215 F.Supp. 169.

3. Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350 (1962), holding a statute which gave citizens of one district twice the voting strength of citizens of another district while voting for the State Senate to be invidiously discriminatory. See also Thigpen v. Meyers, (D.C.W.D.Wash., N.D.1962) 211 F.Supp. 826, and Sincock v. Duffy, supra.

States Congress and the State. See Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). So, until there is some authoritative ruling to the contrary, we must assume that equality of voting power is demanded with respect to both houses.

It is to be conceded that the Fourteenth Amendment does not require absolute equality. This is apparent from the opinion of Mr. Justice Douglas;[4] in other words, some other factors may be taken into account. It would seem, however, that this is in recognition of the fact that perfect exactness as to the number of inhabitants of each electoral district is a practical impossibility.[5] Beyond this, however, fairness requires that every individual be guaranteed the right to cast an effective vote.[6]

Although the Supreme Court in Gray v. Sanders, supra, did not have before it the present question, it nevertheless expressed the philosophy of non-dilution of the vote of the individual citizen. It extracted this philosophy not only from the Constitution, but from the history of the United States, and it is to be concluded therefrom that a properly apportioned state legislative body must at least approximate by bona fide attempt the creation of districts substantially related to population. In Sincock v. Duffy, 215 F.Supp. 169, it was said:

"Such affirmative action must be rendered possible and, as we have already indicated, an apportionment should not be permitted that would allow a blockage of major legislation desired by the great majority of electors of Delaware to come to pass in the Senate. *Effecting the will of the majority of the people of a State must be deemed to be the foundation of any apportionment plan.* * *"
[Emphasis supplied]

Even if we assume that the factors which have been given weight in the majority opinion are properly to be considered, nevertheless, the disparities which exist in Amendment No. 7 cannot be rationalized. Criteria such as were applied by the majority here were used in the case of W. M. C. A. Inc. v. Simon, (D.C.So.D.N.Y., 1962), 208 F.Supp. 368. Disparities in the New York law were relatively slight, New York City, for example, having 46 per cent. of the state's population, was shown to have had 43.1 per cent. of the total number of senators. The ten most populous counties are shown to have had 65.5 per cent. control of the Senate. The factors approved in W. M. C. A., supra, for determining whether or not invidious discrimination existed, were the following:

"(1) Rationality of state policy and whether or not the system is arbitrary.

"(2) Whether or not the present complexion of the legislature has a[n] historical basis.

"(3) Whether there lies within the electorate of the State of New York any possible remedy (if gross inequalities exist.)

"(4) Geography, including accessibility of legislative representatives to their electors.

"(5) Whether the Court is called upon the invalidate solemnly enacted State Constitutions and laws." 208 F.Supp. at 374.

Applying these factors, or tests in the present case, produces a result different from that which obtained in W. M. C. A.

**1.** *Rational or Arbitrary?*

Amendment No. 7 was not adopted upon a basis of recognizing geographic, topographic and economic differences. As shown above, Amendment No. 7 arbitrarily froze existing apportionment and at the same time furnished one additional senator to each of four populous metropolitan counties by writing into the Colo-

---

4. Baker v. Carr, supra.

5. See, for example, State ex rel. Lein v. Sathre, 113 N.W.2d 679, (N.Dak., 1962); Wisconsin v. Zimmerman, 209 F.Supp. 183 (D.C.W.D.Wis., 1962).

6. Moss v. Burkhart, 207 F.Supp. 885 (W.D.Okl., 1962); Thigpen v. Meyers, supra.

rado organic law disparities which had long existed and which we held were gross. It cannot be said that it was rational. The unpleasant truth is that it was particularly designed and dictated not by factual differences, but rather by political expediency. Simplicity and success at the polls overrode considerations of fairness and justice. Thus, Amendment No. 7 fails the test of rationality in its adoption.

### 2. Historic Factors.

The presence of an historical basis has been persuasive in a number of instances.[7] We must be mindful of the fact however, that the present rash of reapportionment litigation is the result of an historical fact; namely, that the several states were in the past predominantly rural. The failure of legislative bodies to recognize population shifts and social changes has produced the present problem. So, therefore, the fact that legislative districts have historic significance has little value in determining what constitutes invidious discrimination. This is particularly true in Colorado, the character of which has substantially changed. The language contained in the opinion of the Court in Toombs v. Fortson (D.C.N.D.Ga., 1962), 205 F.Supp. 248, is pertinent:

"Applying these historical facts to the test of invidiousness, we are unable to discern any justification for continuing this system merely because it has an historical basis in Georgia's political institutions. This is so, primarily, because while historically the statute and constitutional requirements remain substantially the same, the passage of time and changing living habits of the people have distorted· it into something entirely different from what it was at its genesis."

It is difficult to see how history can be of value other than for an explanation of disparities—it can not justify them.

### 3. Alternative Remedies.

The majority were impressed by the argument that the initiative in Colorado is relatively easy so that the voters could readily change the Constitution if the inequities became oppressive. Here again, it is of little consolation to an individual voter who is being deprived of his rights that he can start a popular movement to change the Constitution. This possible remedy is not merely questionable, it is for practical purposes impossible. This was recognized by the United States District Court for the District of Nebraska in League of Nebraska Municipalities v. Marsh, (D.C.D. Nebr., 1962) 209 F.Supp. 189, where it was said:

"To say that such a remedy is adequate for one ordinary voter, and we are here concerned with the rights of an individual voter, for concededly one ordinary voter could maintain this action, is being impractical. In addition, the expense of putting an initated proposal on the ballot in Nebraska is prohibitive for the ordinary voter."

### 4. Geography and Economics.[8]

Much emphasis is placed on Colorado's heterogeneous topography, sparce settlement of mountainous areas, inaccessibility of some communities, and the great distances as justifying the disproportion. In order to soften the impact resulting from population disparities in the districts, the opinion makes comparisons of various regions rather than comparisons of senatorial districts. Such realignment is not, of course, valid, but even this approach shows disparities which are gross and glaring. The majority's Western Region has on the average

---

7. W. M. C. A. Inc. v. Simon (D.C.So.D. N.Y., 1962), 208 F.Supp. 368; Maryland Committee for Fair Representation, et al. v. Tawes, 229 Md. 406, 184 A.2d 715 (1962); Sobel v. Adams, (D.C. S.D.Fla., 1963) 214 F.Supp. 811.

8. (Although economics have not been considered as a factor in W. M. C. A. v. Simon, supra, the majority opinion has stressed it and it is undoubtedly to be considered.)

a population of 28,480 per senator as against the South Central's 22,185 and the East Slope's 57,283.[9] Since disparities of 2-to-1 and 2½-to-1 are sufficiently substantial as to be invidious this glossing, or cloaking and juggling of districts technique fails to camouflage the facts and does not diminish the disproportion. The case could be different if the framers had developed the scheme of Amendment No. 7 as a preconceived plan—part of a good faith effort to balance off these geographic factors. Such is not the case. Instead, Amendment No. 7 is the product of a mechanical and arbitrary freezing accomplished by adoption, with slight modification, of the unlawful alignments which had existed in the previous statute.[10]

The tendered explanation for a 3.6-to-1 and sometimes 3-to-1, and often 2-to-1 disparity between voting strength on the ground that "in no other way may representation be afforded to insular minorities," carries little weight when considered in the light of modern methods of electronic communication, modern highways, automobiles and airplanes. When a man had to ride on horseback from his constituency to the capital, or to settlements within his district, there might have been valid basis for the geographic factors which are here weighted so heavily. Under the circumstances of the present there can be but little consideration given to this geographic factor. Distances as the crow flies now have little relevance in formulating electoral districts.

Economics has also been given great weight by the majority. The practical difficulties in giving effect to economic factors are mentioned in Moss v. Burkhart, 207 F.Supp. 885 (Appendix). The major difficulty is that the economic institutions in a dynamic society change rapidly. Certain industries, such as mining in Colorado, rise and fall in a few short years and political institutions must be devised to withstand the ravages of time and change. It is foolish to say that because an area sustained a substantial mining industry at some previous time, it deserves greater representation today; or, because one area has cattle or a surplus of water, that it deserves greater representation. The folly of this kind of reasoning is at once apparent. Governments are devised to arrange the affairs of men. Economic interests are remarkably well represented without special representation. It is dangerous to build into a political system a favored position for a segment of the population of the state. There exists no practical method of ridding ourselves of them, and long after the institutions pass, the built-in advantage remains even though it is at last only a vestige of the dead past.[11]

5. *Whether solemnly enacted state laws must be invalidated.*

There is, of course, a presumption of validity which attaches to any enactment, and the presumption is undoubtedly stronger when the law is a constitutional amendment adopted by vote of the people. This presumption does not, however, have the strength attributed to it by the majority when it says:

"The plaintiffs rest their case on the argument that the apportionment of the Senate by Amendment No. 7 is arbitrary, invidiously discriminatory, and without any rationality. The voters of Colorado have themselves answered these charges. * * * *"

And again, they say:

"* * * The actions of the electorate are material to the application of the criteria. The contention that the voters have discriminated against themselves appalls rather than convinces. * * * *"

And finally:

"The electorate of every county from which the plaintiffs come pre-

9. See Exhibit "C" of the majority opinion.

10. (Cf. Scholle v. Hare, supra, wherein the amalgamation of contiguous counties supposedly having similar interests, was

without serious regard for population differences between districts. This was condemned.)

11. (See Moss v. Burkhart, supra.)

ferred Amendment No. 7. In the circumstances it is difficult to comprehend how the plaintiffs can sue to vindicate a public right. * * *"

The protection of constitutional rights is not to be approached either pragmatically or expediently, and though the fact of enactment of a constitutional provision by heavy vote of the electorate produces pause and generates restraint we can not, true to our oath, uphold such legislation in the face of palpable infringement of rights. Thus, state racial legislation would unquestionably enjoy overwhelming electorate approval in certain of our states, yet no one would argue that this factor could compensate for manifest inequality. It is too clear for argument that constitutional law is not a matter of majority vote.[12] Indeed, the entire philosophy of the Fourteenth Amendment teaches that it is personal rights which are to be protected against the will of the majority.[13] The rights which are here asserted are the rights of the individual plaintiffs to have their votes counted equally with those of other voters. This factor the majority seems to have lost sight of. The opinion even refuses to recognize that the equal protection clause is the applicable standard when it declares:

"* * * [b]y majority process the voters have said that minority process in the Senate is what they want."

The opinion in still another place states:

"If we reject the republican form of government standard as a basis for judicial action, we are left with the Due Process Clause to support an assertion of denial of equal protection upon the theory that unequal representation denies equal protection because minority process is not due process."

This confusion of the equal protection and due process clauses, plus lamenting the fact that the republican form of government is not the test, must be attributed to a desire and a search for a more flexible basis. The fact is that the equal protection and due process clauses of the Fourteenth Amendment are not coextensive and coterminous.[14] The equal protection clause is an independent limitation on state action which is in no way dependent upon the due process clause. It is straightforward and exacting in its requirements that the rights of all citizens shall be equated upon an equal scale under the law; laws which grant preferences are thus repugnant. It is impossible to justify substantial differences between voting rights accorded to voters who live in the mountains, for example, as opposed to those who reside in the cities, and any attempts to rationalize on the basis of geography, sociology or economics will, as has been shown above, necessarily rest upon the subjective evaluation of the minds which attempt the rationalization. Moreover, to say that a majority of the voters today indicate a desire to be governed by a minority, is to avoid the issue which this court is asked to resolve. It is no answer to say that the approval of the polling place necessarily evidences a rational plan. The plaintiffs have a right to expect that the cause will be determined in relation to the standards of equal protection. Utilization of other or different standards denies them full measure of justice.

I do not say that a rational plan can not be devised which is not based upon strict numerical equality. It is enough to say that the instant plan, with its gross and glaring inequalities, is not based upon a rational formula or upon any formula which is apparent. Moreover, a plan which builds into the state organic law senatorial districts which are designed to be static in perpetuity, regardless of population changes, is

12. (Moss v. Burkhart, supra, and Thigpen v. Meyers, cited supra.)

13. Baker v. Carr (D.C.M.D.Tenn., 1962), 206 F.Supp. 341; Sincock v. Duffy (D.C. D.Del., 1963), 215 F.Supp. 169; Brunson v. Board of Trustees of School District No. 1 (D.C.E.D.So.Car., 1962) 30 F.R.D. 369.

14. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

doomed to obsolescence before it becomes effective.

Amendment No. 7 violates the Constitution of the United States and is, therefore, invalid and void. Amended Section 46 of Amendment No. 7, which redistricts the House of Representatives, can not be severed from Amended Section 46, and hence the entire Amendment is void. I would so hold.